**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO, et al., Appellants,**

v.

**John R. BLOCK, Secretary of Agriculture, et al.**

**No. 79–2128.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 9, 1980.

Decided March 18, 1981.

Mitchell Jay Notis, Washington, D. C., with whom James R. Rosa, Washington, D. C., was on the brief, for appellants.

Anne M. Gulyassy, Washington, D. C., of the bar of the Supreme Court of Michigan, pro hac vice, by special leave of court, with whom Alice Daniel, Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty., and William G. Kanter, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellee Secretary of Agriculture.

James F. Rill and David W. Burling, Washington, D. C., were on the brief for appellee National Broiler Council.

Before TAMM and ROBINSON, Circuit Judges, and HARLINGTON WOOD, Jr., Circuit Judge, United States Court of Appeals for the Seventh Circuit.[*]

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

At issue in this case is the response by the Department of Agriculture to a judicial directive to employ uniform standards in the enforcement of inspection rates in poultry processing plants. Because we find that an unusual emergency situation arose as a result of this directive, we hold that the Department possessed good cause to publish regulations that were immediately effective. Given the breadth of these regulations, however, justification did not exist for their promulgation as final and permanent regulations without the public procedures required by the Administrative Procedure Act. We therefore affirm the judgment of the district court as modified and direct the Department to institute rulemaking proceedings forthwith.

## I. BACKGROUND

In November of 1978 certain Arkansas poultry processors and the Attorney General of the State of Arkansas brought suit against the Department of Agriculture (USDA or Department) in the District Court for the Eastern District of Arkansas alleging discrimination in the enforcement of inspection rates in processing plants. No formal regulations existed governing these rates; instead, USDA had made available informal guidelines that by virtue of varying interpretations had resulted in the enforcement of different maximum allowable inspection rates.[1] This variation in rates had then been frozen by a "status-quo order" issued by the Department in late 1976 or early 1977. Finding no justification for this disparity, the District Court for the Eastern District of Arkansas ordered then Secretary Bergland and the Department "to

---

[*] *Circuit Judge* Wood did not participate in the disposition of this case.

1. The Department's authority to issue these guidelines and related regulations stems from the Poultry Products Inspection Act as amended by the Wholesome Poultry Products Act, codified at 21 U.S.C. § 451 *et seq.* (1976).

use uniform inspection rate standards and to apply and enforce same uniformly" and not to permit "to exist any practice which results in disparate inspection rate standards for same or similar situations." *Arkansas Poultry Federation v. Bergland*, No. LR–C–78–395 (E.D. Ark. Apr. 3, 1979), *reprinted in* Joint Appendix (J.A.) at 17. The court further ordered the defendants to file a report on April 16, 1979 "setting forth in detail the manner and form in which defendants have complied with the injunctive provisions of this order." *Id.*, J.A. at 17–18.

On April 13, 1979, the Department complied with this order by publishing two final and immediately effective regulations based upon recommendations made by a study group of inspection officials in a November 1978 report. The first rule, entitled "Young Chicken Slaughter Inspection Rate Maximums," established as uniform maximum inspection rates those currently in effect in the Southwest region, increased by five percent.[2] 44 Fed.Reg. 22,047 (1979) (codified in 9 C.F.R. § 381.67), J.A. at 19–21. The second rule, "Modified Traditional Poultry Inspection," established an alternate method of poultry inspection to be used whenever inspection efficiency would increase as a result. 44 Fed.Reg. 22,049 (1979) (codified in 9 C.F.R. § 381.76), J.A. at 21–23. In this rule, the Department proposed that "considerable time savings" would result from a procedure that reduces the number of motions required of an inspector and splits the inspection task so that each young chicken is examined by two inspectors. J.A. at 21.

USDA noted that the regulation establishing uniform inspection rates had already been prepared as a proposed rule. In order to comply with the court order noted above, however, "and to assure that the consumer is adequately protected," the Department asserted that "this regulation providing for national uniform maximum inspection rates must be issued immediately." J.A. at 20. The Department further claimed for both regulations that their emergency nature constituted good cause to forego "notice and other public procedure" and to make them immediately effective. USDA did solicit, however, written or oral comments upon these regulations for a period of ninety days after their promulgation.

On July 3, 1979, appellants filed a complaint in the United States District Court for the District of Columbia against Robert Bergland, Secretary of the Department of Agriculture, alleging the invalidity of these regulations on both procedural and substantive grounds. On July 27, 1979, the district court granted summary judgment for the defendants. The plaintiffs then filed this appeal.

## II. DISCUSSION

The procedural[3] question in this case is simply stated: whether the Department possessed good cause to forego the rulemaking requirements of section 553 of the Administrative Procedure Act (APA). 5 U.S.C. § 553 (1976). Two specific requirements are pertinent here, the notice requirement of section 553(b) and that of 553(d). Section 553(b) requires that general notice of proposed rulemaking be published in the Federal Register; section 553(d) requires that a rule be published not less than thirty days before its effective date. To each of these requirements, however, the APA provides a good cause exception. An agency may avoid the 553(b) requirement if it "for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B) (1976). An agency may also avoid its 553(d) notice obliga-

---

2. The increase was obtained through the elimination of the inspection procedure known as tibia palpation, a procedure designed to detect osteopetrosis or "marble bone." Elimination of this procedure was thought acceptable because the disease does not occur in young chickens. Affidavit of Merlin A. Nelson, ¶ 5, J.A. at 136.

3. Because of our disposition of this case on procedural grounds, we do not address plaintiffs' substantive attacks upon the regulations.

tion "for good cause found and published with the rule." 5 U.S.C. § 553(d)(3) (1976).

■ We begin our examination of the Department's assertion of these exceptions with the firm understanding that the exceptions to the provisions of section 553 "will be narrowly construed and only reluctantly countenanced." *State of New Jersey, Department of Environmental Protection v. EPA*, 626 F.2d 1038, 1045 (D.C.Cir. 1980). *See generally* Note, *The "Good Cause" Exceptions: Danger to Notice and Comment Requirements Under the Administrative Procedure Act*, 68 Geo.L.J. 765 (1980). As the legislative history of the APA makes clear, moreover, the exceptions at issue here are *not* "escape clauses" that may be arbitrarily utilized at the agency's whim. S.Rep.No. 752, 79th Cong., 1st Sess. (1945), *reprinted in* Administrative Procedure Act, Legislative History, 79th Cong. 1944–46 at 200, 201. Rather, use of these exceptions by administrative agencies should be limited to emergency situations, *id.* at 200; furthermore, the grounds justifying the agency's use of the exception should be incorporated within the published rule.

As we stated above, two specific requirements of section 553 are at issue here. Both the requirement of 553(b) that notice of proposed rulemaking be published in the Federal Register and the requirement of 553(d) that publication of a rule be made at least thirty days prior to its effective date serve the laudable purpose of informing affected parties and affording them a reasonable time to adjust to the new regulation. Section 553(b) serves, however, the even more significant purpose of allowing interested parties the opportunity of responding to proposed rules and thus allowing them to participate in the formulation of the rules by which they are to be regulated. The more expansive the regulatory reach of these rules, of course, the greater the necessity for public comment. *See National Nutritional Foods Association v. Kennedy*, 572 F.2d 377, 385–86 (2d Cir. 1978).

■ In light of the different purposes served by these two requirements, we believe that different standards govern the applicability of the good cause exceptions to these requirements. Further support for this view is found in the more detailed language of section 553(b)(B) which provides that an agency may forego notice-and-comment procedures in this context only upon a finding that such procedures are "impracticable, unnecessary, or contrary to the public interest." We do not break new ground when we hold, based upon the language of the APA and the underlying purposes of the subsections at issue, that what may constitute good cause to forego one notice requirement may not satisfy the other. *See Rowell v. Andrus*, 631 F.2d 699, 703 (10th Cir. 1980); *Kollett v. Harris*, 619 F.2d 134, 145 & n.15 (1st Cir. 1980); *State of New Jersey, Department of Environmental Protection v. EPA*, 626 F.2d at 1047; *United States Steel Corp. v. EPA*, 605 F.2d 283, 289–90 (7th Cir. 1979), *cert. denied*, 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980);[4] *United States v. Gavrilovic*, 551 F.2d 1099, 1104 & n.9 (8th Cir. 1977).

In this case the Department found itself subject to court order to institute uniform inspection rate standards. The Department had argued before the District Court for the Eastern District of Arkansas that the suit brought by the poultry processors should be dismissed or, alternatively, that proceedings should be stayed based in part upon the impending rulemaking proceedings. The Department informed the court

---

**4.** We do not agree, however, with the analysis of these two exceptions found in *United States Steel Corp. v. EPA*, 605 F.2d 283, 289–90 (7th Cir. 1979), *cert. denied*, 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980). The court there apparently found the good cause exception of section 553(d)(3) to act as an alternative justification for the lack of the notice-and-comment procedures mandated by section 553(*b*). Such an analysis misreads the statute and ignores the legislative history. The only exceptions for the absence of public procedures are found within section 553(b) itself. *Western Oil and Gas Association v. EPA*, 633 F.2d 803 (9th Cir. 1980); *State of New Jersey, Department of Environmental Protection v. EPA*, 626 F.2d at 1048.

by its memorandum filed March 27, 1979, that it expected proposed rules to receive final departmental approval and to be published for notice-and-comment by the end of April. Memorandum In Support Of Defendants' Motions To Dismiss Or, In The Alternative, To Stay Proceedings at 18, *Arkansas Poultry Federation v. Bergland*, No. LR–C–78–395 (E.D. Ark. Apr. 3, 1979). On April 3, however, the court granted the plaintiffs' motion for preliminary injunction, declaring the informal guidelines under which the regional inspectors had been operating null and void. The Department was ordered "*forthwith* to use uniform inspection rate standards . . . ." *Id.* at 2 (Order), J.A. at 17 (emphasis added). The Department then published the two regulations at issue here in the Federal Register on April 13, 1979, promulgating them as final and immediately effective.

■ We believe that the promulgation of emergency regulations by the Department was a reasonable and perhaps inevitable response to the injunctive court order issued on April 3. Although the trial judge indicated that he was only voiding the status quo order and was not mandating the action to be taken by the Department to comply with his injunction,[5] the absence of specific and immediate guidance from the Department in the form of new standards would have forced reliance by the Department upon antiquated guidelines, thereby creating confusion among field administrators, and caused economic harm and disruption to those northeastern processors whose inspection lines ran at varying speeds. This harm would not have been limited to those within the broiler industry but would have extended in all likelihood to the consumer in the form of poultry shortages or increases in consumer prices. J.A. at 23. We believe that the issuance of emergency regulations to ameliorate this expected harm and, at the same time, to comply with the court order did not violate section 553 of the Administrative Procedure Act. *See Valiant Steel and Equipment, Inc. v. Goldschmidt*, 499 F.Supp. 410 (D.D.C.1980) (implementing congressional mandate); *Friendship Dairies, Inc. v. Butz*, 432 F.Supp. 508 (E.D.N.Y.) (economic problems in dairy industry), *aff'd*, 573 F.2d 1290 (2d Cir. 1977). *Cf. Hercules, Inc. v. EPA*, 598 F.2d 91, 129 (D.C.Cir.1978) (omission of tentative decision justified by deadlines).

■ The Department has failed to offer, however, and we have been unable to discover, any justification for the issuance of *permanent* regulations of this breadth in response to this situation. Common sense suggests that any administrative action taken in a rare "emergency" situation such as the one at hand,[6] while perhaps necessarily "immediately effective," need only be temporary, pending public notice-and-comment procedures. *Valiant Steel and Equipment, Inc. v. Goldschmidt*, 499 F.Supp. 410, at 412–413 (D.D.C.1980). Here, however, we hold only that detailed regulations which respond—as these do—to much more than the exigencies of the moment must be promulgated through public procedures before they are chiseled into bureaucratic stone.[7] Although in this case much study had apparently been done prior to the publication of the regulations, such preparedness may not characterize future situations.

---

5. "Now nothing herein shall be deemed to interfere with defendant's further pursuit of some new uniform standards through rulemaking procedures or otherwise, if the defendants deem such course appropriate in the discharge of their legitimate legislative mandates." Transcript of Hearing on Temporary Restraining Order at 7, *Arkansas Poultry Federation v. Bergland*, No. LR–C–78–395 (E.D.Ark. Apr. 3, 1979).

6. We believe that administrative agencies should remain conscious that such emergency situations are indeed rare and that courts will examine closely proffered rationales justifying the elimination of public procedures. *See, e. g., Mobil Oil Co. v. Dep't of Energy*, 610 F.2d 796, 803 (Temp. Emer. Ct. App. 1979) (no emergency situation existed), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980).

7. We are especially concerned in this case with the Department's promulgation of the regulation concerning modified inspection procedures. Although clearly rationally related to inspection rates, this rule is less easily viewed as a necessary response to the court's directive.

Therefore, once an emergency situation has been eased by the promulgation of interim rules, it is crucial that the comprehensive permanent regulations which follow emerge as a result of the congressionally-mandated policy of affording public participation that is embodied in section 553. We do not find in the case at hand any reason to believe that, once the interim rules were published, notice and public procedure would have been "impracticable, unnecessary, or contrary to the public interest" in the formulation of the final regulations governing inspection standards, speeds, and techniques in poultry processing plants.

Our decision today to uphold the regulations as interim ones is not in conflict with prior case law invalidating even temporary regulations as violative of section 553(b). In *American Iron and Steel Institute v. EPA*, 568 F.2d 284 (3d Cir. 1977), the court addressed the procedural validity of regulations governing steelmaking processes within the specialty steel industry. The Environmental Protection Agency published the regulations in "interim final" form because of an expressed need to expedite implementation of the Federal Water Pollution Control Act and because the agency was acting under a court order requiring the promulgation of regulations for this industry category. The court order required the promulgation of regulations no later than March 15, 1976; the EPA published the rules in the Federal Register on March 19, 1976. As the court pointed out, however, the agency had been under court order since November of 1973. Furthermore, the EPA had published in August of 1975 a notice of proposed rulemaking listing the subcategories of the steel industry for which tentative regulations were being prepared; this list did not include specialty steel. The court thus held invalid the applicability of the regulations to the specialty steel industry. *Id.* at 292.

In *Kollett v. Harris*, 619 F.2d 134 (1st Cir. 1980), the court struck down interim regulations implementing amendments to the Social Security Act. The amendments had gone into effect on January 1, 1974; the agency claimed, therefore, that "abundant and obvious" good cause existed for the promulgation of the regulations published on January 22 of that year without notice and public procedures. *Id.* at 145. The court pointed out, however, that *fourteen months* had intervened between the passage of the amendments and their effective date. No justification could be advanced for the agency's failure to conduct public notice-and-comment procedures within the time available.

In each of these cases, therefore, the court held promulgation of even interim regulations invalid without public procedures. In each case, however, the respective agency had a substantial period of time within which to prepare regulations, the promulgation of which it knew was both necessary and forthcoming in the near future. In such a case we can agree that "the mere existence of deadlines for agency action, whether set by statute or court order, does not in itself constitute good cause for a § 553(b)(B) exception." *United States Steel Corp. v. EPA*, 595 F.2d 207, 213 (5th Cir. 1979). In the case at hand, however, the Department operated not under a deadline which gave it substantial time within which to take action but rather under a judicial directive to take immediate action. The promulgation of interim and immediately effective regulations without public procedures was thereby made necessary.

In modifying the judgment of the district court and affirming these regulations as interim ones, we are not unmindful of the possibility of heightened agency resistance to suggested changes to final rules, albeit temporary ones, in contrast to the reception accorded responses to proposed rules. We agree that "[p]ermitting the submission of views after the effective date [of a regulation] is no substitute for the right of interested persons to make their views known to the agency in time to influence the rule making process in a meaningful way." *City of New York v. Diamond*, 379 F.Supp. 503, 517 (S.D.N.Y.1974). For this reason the Department's solicitation of comments on its regulations for a period of ninety days, while laudable, does not satisfy the statutory criteria at issue here. We have no reason to believe, however, that the Department will fail to respond in a knowledgeable and even-handed manner to criticisms

of its temporary regulations. Of course, should plaintiffs not be satisfied with the permanent regulations that emerge from notice-and-comment rulemaking, judicial review of the final regulations will be available to them; furthermore, the administrative response to public criticism will be of substantial aid in this review.

### III. CONCLUSION

Although it might be thought that our decision today requires of the Department foresight equal to our hindsight, *State of New Jersey, Department of Environmental Protection v. EPA*, 626 F.2d at 1047 n.11, we believe that the Department could have reconciled the statutory commands of the Administrative Procedure Act with the judicial command embodied in the injunctive order by promulgating these regulations as interim regulations and instituting notice-and-comment procedures for the promulgation of permanent rules. As Chief Judge McGowan has stated, "[i]f the admonition to construe the good-cause exception of section 553(b)(B) narrowly means anything, it means that we cannot condone its invocation where, as here, such a reconciliation is possible." *Id.* at 1047. We affirm the judgment of the district court as modified and direct the Secretary to institute rulemaking proceedings forthwith.

*It is so ordered.*