Mohamed ISHTYAQ et alia, Petitioners,

v.

Alan NELSON, etc., et alia,
Respondents.

No. CV–82–2288.

United States District Court,
E.D. New York.

Oct. 4, 1983.

Lawyers Committee for International Human Rights by Arthur C. Helton, New York City, for petitioners.

Raymond J. Dearie, U.S. Atty., E.D.N.Y. by Winstanley Luke, Asst. U.S. Atty., Brooklyn, N.Y., for respondents.

SIFTON, District Judge.

This is a proceeding seeking the issuance of a writ of habeas corpus instituted by thirty-three Afghan and three Iranian nationals who claim that they are being unlawfully detained by the Immigration and Naturalization Service ("INS"). Petitioners are said to have arrived in the United States from India and Pakistan between January 1982 and May 1983 and, upon arrival, to have applied for political asylum pursuant to 8 U.S.C. § 1158(a) on the ground that they are refugees and will be persecuted in their respective home countries if they return to them.[1] At least thirteen petitioners continue to be detained

---

1. Counsel for petitioners has advised that petitioner Mohammad Amin Sayedi was released on April 27, 1983, after posting a $2,500 bond and that petitioner Azizoddine Amiri was deported on May 3, 1983. One of the three Iranian petitioners, Freydoon Ghahrmanloo, is said to have been recently granted political asylum and released. Affidavit of Arthur C. Helton, July 12, 1983, at pp. 1–2. Twenty petitioners, Messrs. Ahmad, Ahmed, Akbar, Alami, Azizi, Batheja, Channa, Ghafar Hatemi, Satar Hatemi, Karimi, Khalid, Khwaja, Masfer Zada, Mashriqi, Naim, Nasary, Rahmani, Shabuddin, Shaghassi, and Tahir, are said to have been released by the INS pursuant to a revised detention policy adopted on June 27, 1983.

pursuant to 8 U.S.C. § 1225(b) [2] at the INS Processing Center in Brooklyn pending determination of their applications for political asylum and the conclusion of exclusion proceedings pursuant to 8 U.S.C. §§ 1225 and 1226. Those who continue to be detained seek the issuance of a writ of habeas corpus and their immediate release on the grounds that their detention is violative of the Constitution, the federal immigration laws, the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (the "Act"), and the international legal obligations of the United States as reflected in international agreements and general principles of customary international law.

The matter is currently before the Court on petitioners' motion pursuant to Rule 56 of the Federal Rules of Civil Procedure awarding them summary judgment and the immediate issuance of a writ of habeas corpus. For the reasons to be stated, petitioners' motion is denied.

## BACKGROUND

It is undisputed for purposes of this motion that petitioners are Afghan and Iranian refugees who fled their respective countries to escape persecution following the Soviet invasion of Afghanistan in December 1979 and the change of government in Iran. They allege that they initially emigrated to either India or Pakistan. After having been denied permission to enter the United States as refugees by American diplomatic officials in India and Pakistan, the petitioners obtained false travel documents in those countries and flew to the United States. They were detained upon arrival at John F. Kennedy International Airport in New York when the INS questioned their travel documents and deemed them inadmissible pursuant to 8 U.S.C. § 1182(a)(19), (20). Exclusion proceedings were then instituted against them pursuant to 8 U.S.C. §§ 1225 and 1226. Petitioners then applied for political asylum pursuant to 8 U.S.C. § 1158(a). With respect to at least certain

of the Afghan petitioners, government officials are said to have agreed that their fear of persecution upon return to Afghanistan is well-founded, but are said to have denied them entry and ordered them deported on the ground that they failed to comply with prescribed procedures for applying for refugee status abroad. Other petitioners are said to still have motions and/or appeals pending with respect to their asylum applications. As for those petitioners for whom final orders of exclusion and deportation have been issued, the INS has been unable to execute those orders in light of the refusal of India and Pakistan to accept those petitioners as deportees and is said to have released them from detention.

## THE PRESENT MOTION

The standard under which a summary judgment motion is tested requires a showing "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Federal Rules of Civil Procedure 56(c). As the Court of Appeals recently stated:

"The burden rests on the moving party to demonstrate the lack of genuine fact issue. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 [90 S.Ct. 1598, 1608, 26 L.Ed.2d 142] (1970). In its search of the record the court should resolve all ambiguities and inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 [82 S.Ct. 993, 994, 8 L.Ed.2d 176] (1962); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980). The possibility that a factual issue *may* exist will not defeat the motion, rather the party opposing summary judgment must indicate that a genuine dispute as to a material fact does exist. Uncertainty as to the true state of any material fact defeats the motion. *Quinn*, 613 F.2d at 445."

---

2. "Every alien ... who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer."

*United States v. One Tintoretto Painting,* 691 F.2d 603, 606 (2d Cir.1982) (Emphasis in original.)

There is a dispute, albeit legal rather than factual, between the parties as to the precise basis for each petitioner's present detention. Petitioners allege that those among their number who were first detained prior to July 9, 1982, are being detained pursuant to INS internal guidelines first implemented in the New York district of the INS in January 1982. The New York district office is said to have acknowledged the application of these guidelines to these petitioners in several notations in the work files of release requests disclosed by the INS to petitioners. These guidelines are said to have been revised once in April 1982 with respect to the release of juveniles and again on June 27, 1983, to permit INS district directors to consider the release of detainees who have been issued final orders of deportation and whose departure could not be enforced by the INS. Twenty petitioners are said to have already been released pursuant to this policy revision.[3]

Petitioners further allege that those who were first detained after July 9, 1982, are being detained pursuant to inadmissible alien detention and parole regulations published in the Federal Register on that date as an immediately effective "interim rule," 47 Fed.Reg. 30044–46, later adopted with amendments as a final rule on October 19, 1982, 47 Fed.Reg. 46493–94, and now set forth at 8 C.F.R. §§ 212.5, 235.3 (1983).

Petitioners argue that the detention of those who were first detained prior to July 9, 1982, the date the INS first published its presently effective alien detention regulations in the Federal Register, is unlawful because that detention was originally effected pursuant to agency regulations which were not adopted in conformity with the notice and comment rulemaking provisions of the Act—an argument to which I now turn.

Petitioners do not argue that the two sets of regulations are, as applied, substantially different so that detainees have been or are being treated differently depending on which set of regulations provided the basis for their original detention. Nor do they, for purposes of this motion at least, dispute the Government's representation that any alien entitled to release under the currently effective regulations will be released without regard for the basis for his original detention. Rather, they argue that, since the INS internal guidelines pursuant to which pre-July 9, 1982 detentions were effected were defective under the notice and comment rulemaking provisions of the Act, that procedural defect renders their continued detention unlawful.

On June 18, 1982, Judge Eugene Spellman of the United States District Court for the Southern District of Florida ruled that what was shown to be the government's shift to a "new policy" with respect to the detention and parole of Haitian refugees was a "rule" within the meaning of § 551(4) of the Act not otherwise excepted from the Act's rulemaking provisions and that this policy was, accordingly, unlawfully promulgated and void because the government failed to comply with the notice and comment rulemaking requirements of § 553(b) and (c) of the Act. *Louis v. Nelson,* 544 F.Supp. 973 (S.D.Fla.1982). This aspect of Judge Spellman's decision was later affirmed by the Court of Appeals. *Jean v. Nelson,* 711 F.2d 1455, 1474–83 (11th Cir.1983). Assuming *arguendo* that this holding is equally applicable to the shift in policy said by petitioners to have been adopted in the New York district in January 1982, it is undisputed that, as noted above, the INS, on July 9, 1982, published an immediately effective interim rule, later adopted with amendments as a final rule on October 19, 1982, which superseded the agency's pre-existing internal guidelines first implemented in January 1982 and which from the date of publication forward governed the detention and parole of aliens detained after that date and those detained previously and still

---

**3.** *See* note 1, *supra.*

in custody. In publishing this rule the INS stated that it was doing so in compliance with Judge Spellman's ruling in *Louis v. Nelson*, 47 Fed.Reg. at 30044. Assuming that this rule was validly promulgated in conformity with the Act and related regulatory requirements, a point which petitioners also contest and which will be addressed below, the promulgation of this rule served to cure and render moot any complaint petitioners may have had with respect to any invalid promulgation of a new rule with regard to aliens in January 1982, recalling that petitioners make no claim that the two sets of regulations afforded them differing treatment. *Compare Brown Express, Inc. v. United States*, 607 F.2d 695 (5th Cir.1979); *BASF Wyandotte v. Costle*, 582 F.2d 108 (1st Cir.1978); *Pickus v. U.S. Board of Parole*, 507 F.2d 1107 (D.C.Cir.1974). Whatever denial of rights to participate in the rule promulgation process which petitioners may have been denied as a result of the allegedly invalid promulgation of the INS internal guidelines was cured by the fact that they were offered an opportunity to comment on the rule published on July 9, 1982, as part of the Act's rulemaking process.

However, as has already been indicated, petitioners also argue that, even as published and finally adopted, the INS' inadmissible alien detention and parole regulations were not validly promulgated in conformity with the Act and related regulatory requirements. Accordingly, I turn to that argument.

First, petitioners assert that the regulations are "in excess of [the] authority" of the INS and thus invalid under 5 U.S.C. § 706(2)(C). Second, they assert that the regulations are "arbitrary [or] capricious"

and thus invalid under 5 U.S.C. § 706(2)(A). Third, they assert that the INS has failed to show "good cause" for publishing the regulations on July 9, 1982, as an immediately effective interim rule, as the agency must do in order to justify their publication less than 30 days before their effective date. 5 U.S.C. § 553(d)(3). Fourth, they assert that publication of the regulations was defective because it failed to include the regulatory flexibility analysis required under 5 U.S.C. § 603 and failed to comply with Executive Order 12291.

■ Petitioners' contention that the inadmissible alien detention and parole regulations are not within the statutory authority of the INS is based on their assertion that the regulations prescribe mandatory imprisonment of inadmissible aliens contrary to what is said to be Congress' intent that detention be the exception rather than the rule. However, while the Court has the power under § 706 of the Act to set aside agency action in excess of statutory authority, *Citizens Committee for the Hudson Valley v. Volpe*, 425 F.2d 97, 102 (2d Cir.), *cert. denied*, 400 U.S. 949, 91 S.Ct. 237, 27 L.Ed.2d 256 (1970), I do not find that the regulations in question are ultra vires.

The Immigration and Naturalization Act, as amended, provides that every alien (other than crewmen, stowaways, and security risks who are governed by other provisions) "who [upon arrival in the United States] may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer." 8 U.S.C. § 1225(b).[4] The procedures for

---

**4.** Contrary to petitioners' assertion, Judge Spellman did not hold in *Louis v. Nelson* that the provision in 8 U.S.C. § 1225(b) stating that "[e]very alien ... who may not appear to the examining officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry" means only that, as petitioners have paraphrased Judge Spellman's decision, "formal 'entry into the United States [is to] be delayed,'—not that the alien is to be 'incarcerated until a final determi-

nation of his admissibility.' " Petitioners' Brief in Support of Motion for Summary Judgement, at p. 45. In the context of his consideration of the argument that the regulations in question were "carrying out a clear legislative mandate" for alien detention and, therefore, did not require notice and comment rulemaking under the Act, Judge Spellman in fact wrote:

"The 'legislative mandate' of [section 1225(b) ] is not as clear as Defendants would lead the

such inquiry are governed by 8 U.S.C. § 1226. *See also* 8 C.F.R. § 236.1. That detention of inadmissible aliens is contemplated by the federal immigration laws to be the rule rather than the exception is further indicated by the fact that the Attorney General is expressly authorized temporarily to parole into the United States "under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States...." 8 U.S.C. § 1182(d)(5). Significantly, the statute further provides:

> "[S]uch parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States."

*Id.* These are in fact the statutory provisions on which the INS relied when it first published the regulations in question. *See* 47 Fed.Reg. at 30044.

Nor do the regulations provide for "mandatory imprisonment" as petitioners allege. The regulations state, *inter alia*, that "[a]ny alien who appears to the inspecting officer to be inadmissible and who arrives without documents ... or who arrives with documentation which appears on its face to be false, altered, or to relate to another person ... shall be detained in accordance with [8 U.S.C. § 1225(b) ]" and that "[p]arole of such aliens may be considered in accordance with [the provisions of the regulations now set forth at 8 C.F.R. § 212.-5(a) ]." 8 C.F.R. § 235.3(b). While the provisions of § 212.5(a) limit the availability of parole to aliens who have serious medical conditions, who are pregnant or juveniles,

who have had relative petitions filed on their behalf, who will be witnesses in proceedings being or to be conducted by judicial, administrative or legislative bodies in the United States, or whose "continued detention is not in the public interest as determined by the district director," such restrictiveness is not at all inconsistent with Congress' authorization of parole "for emergent reasons or for reasons deemed strictly in the public interest...." 8 U.S.C. § 1182(d)(5). As the INS noted in its initial publication of the regulations, the legislative history of the Attorney General's parole authority shows a Congressional intent that that authority be exercised restrictively:

> "The drafters of the Immigration and Nationality Act of 1952 gave as examples situations where parole was warranted in cases involving the need for immediate medical attention, witnesses, and aliens being brought into the United States for prosecution. H.Rep. No. 1365, 82nd Cong., 2d Sess. at 52 (1952). In 1965, a Congressional committee stated that the parole provisions 'were designed to authorize the Attorney General to act only in emergent, individual, and isolated situations, such as the case of an alien who requires immediate medical attention, and not for the immigration of classes or groups outside the limit of the law.' 5 Rep. No. 748, 98th Cong., 1st Sess. at 17 (1965)."

47 Fed.Reg. at 30044.

■ Nor do I find that the detention and parole regulations are contrary to Congressional intent as evidenced in the Refugee Act of 1980, Pub.L. 96–212, 96th Cong., 1st Sess., 94 Stat. 108, which, *inter alia*, incorporated a new definition of the term "refugee" into the federal immigration laws and directed the Attorney General to "establish a procedure for an alien physically present in the United States ... to apply for asy-

---

Court to believe.... The phrase 'shall be detained' could mean that an excludable alien shall be incarcerated until a final determination of his admissibility *or* that his entry into the United States should be delayed until inquiry is made at an exclusion hearing....

But regardless of which view of the statute is correct, this analysis demonstrates that INS' detention policy reflects *their* interpretation of the statute and, therefore, it is a rule under the [Act]."
544 F.Supp. at 944.

lum." 8 U.S.C. § 1158(a). The Senate Report discussing the Refugee Act of 1980 specifically states:

"The Attorney General's parole authority under Section 212(d)(5) of the Immigration and Nationality Act[, 8 U.S.C. § 1182(d)(5),] remains unchanged. Once the bill takes effect, however, the Attorney General does not anticipate using this authority with respect to refugees unless he determines that compelling reasons in the public interest related to individual or groups of refugees require that they be paroled into the United States, rather than be admitted in accordance with proposed Sections 207 or 208."

S.Rep. No. 256, 96th Cong., 1st Sess. 17, *reprinted in* 1980, U.S.Code Cong. & Admin.News, 141, 157. The House of Representatives Conference Report states that, in adopting the House version of the legislation limiting the use of parole to individual refugees under the Refugee Act and requiring that in utilizing parole the Attorney General must determine that " 'compelling reasons in the public interest ... require that the alien be paroled into the United States rather than be admitted as a refugee,' ... [t]he Conferees ... recognize that it does not affect the Attorney General's authority under section 212(d)(5) of the Immigration and Nationality Act to parole aliens who are not deemed to be refugees." H.Conf.Rep. No. 781, 96th Cong., 2d Sess. 20, *reprinted in* 1980, U.S.Code Cong. & Admin.News, 160, 162. It is thus manifest that the Refugee Act of 1980 was not intended to alter, and in fact was intended to reaffirm, the Attorney General's parole authority with respect to aliens such as petitioners.

■ Petitioners' argument that the regulations are invalid as "arbitrary [or] capricious" is equally unavailing. The United States Supreme Court recently characterized the scope of review of agency action in this respect as follows:

"[U]nder this standard, a reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute.... The scope of review under [this] standard is narrow, and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 [83 S.Ct. 239, 245, 9 L.Ed.2d 207] (1962). In reviewing that explanation, we must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*[, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974) ], *Citizens Preserve Overton Park v. Volpe* [, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971) ]. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to move up for such deficiencies: 'We may not supply a reasoned basis for the agency's action that the agency itself has not given.' *SEC v. Chenery Corp.*, 332 U.S. 194, 196 [67 S.Ct. 1575, 1577, 91 L.Ed. 1995] (1947). We will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. *Bowman Trans. Inc. v. Arkansas-Best Freight Systems, supra* [419 U.S.] at 286 [95 S.Ct. at 442]. *See also Camp v. Pitts*, 411 U.S. 138, 142–43 [93 S.Ct. 1241, 1244, 36 L.Ed.2d 106] (1973) (*per curiam* )."

*Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463

U.S. 29, 42–43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983).

Petitioners argue that in promulgating its regulations the INS impermissibly relied on factors that Congress had not intended it to consider because, petitioners assert, the regulations were promulgated to deter aliens outside the country from legally entering the United States. *See* Memorandum of Law in Support of Motion for Summary Judgment at 49. However, there is no evidence that the INS published the regulations to achieve a goal of deterring aliens from lawfully emigrating to the United States. In promulgating the regulations, the INS stated that it was acting to establish an interim rule of immediate application without a 30-day public comment period in light of Judge Spellman's prior holding that the INS detention policy was subject to and fell within the Act's rulemaking requirements, which the INS asserted "created a vacuum in the Service's detention policy and in the enforcement of the immigration laws of the United States." 47 Fed.Reg. at 30044. The INS then added:

> "This vacuum will be prolonged unless the 30 day publication requirement is suspended. If this requirement is not suspended, a significant number of persons who were previously deterred from attempting to enter the United States *illegally* by the Service's detention policy may now enter the United States without fear of being detained until publication is completed." (Emphasis added.)

*Id.* Rather than indicating that the INS was seeking to deter lawfully emigration to the United States, this language indicates that the regulations were promulgated in conformity with and in furtherance of the INS' obligation to enforce the federal immigration laws so as to deter and prevent unlawful entry by detaining aliens who may not appear to be "clearly and beyond a doubt entitled to land." 8 U.S.C. § 1225(b).

Petitioners also argue that adoption of the regulations was "arbitrary [or] capricious" because the INS failed to address in its statement of the basis and purpose for the regulations questions raised regarding the new policy between the time they were published as an interim rule and when they were published as a final rule. This objection is founded on the requirement under § 553(c) of the Administrative Procedures Act that, "[a]fter consideration of the relevant matter presented [during the comment period], the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c). In this regard it has been noted:

> "It is not in keeping with the rational process to leave vital questions, raised by comments which are of cogent materiality, completely unanswered. The agencies certainly have a good deal of discretion in expressing the basis of a rule, but the agencies do not quite have the prerogative of obscurantism reserved to legislatures."

*United States v. Nova Scotia Food Products Corp.*, 568 F.2d 240, 252 (2d Cir.1977). The test of the adequacy of the "concise general" statement has been expressed as follows:

> "We do not expect the agency to discuss every item of fact or opinion included in the submissions made to it in informal rulemaking. We do expect that, if the judicial review which Congress has thought it important to provide is to be meaningful, the 'concise general statement of … basis and purpose' … will enable us to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them as it did."

*Id.* at 252, *quoting Automotive Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C.Cir.1968). In light of this standard I find that, in its publication of the regulations as a final rule on October 19, 1982, 47 Fed.Reg. 46493–94, the INS met its obligation to provide a "concise and general statement of their basis and purpose." The INS noted that it had received fifteen comments from the public on the basis of its July 9, 1982 publication and summarized the views expressed. The INS

also identified its position with respect to the principal objections raised, i.e., that the interim rule was not in compliance with the Act and conflicted with the United National Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 2322, and the Refugee Act of 1980. The INS also responded to claims regarding the breadth and effect of the regulations and addressed these claims, in part, by adopting clarifying amendments to certain provisions of § 212.5 and § 235.3. The information set forth by the INS adequately reveals the major policy issues raised during the comment period and the reasons why the INS chose to "follow one course rather than another." *Industrial Union Dep't v. Hodgson,* 499 F.2d 467, 475 (D.C.Cir.1974), *quoted in Nova Scotia Food Products Corp.,* 568 F.2d at 253.

Petitioners also argue that the INS has failed to show "good cause" for publishing the regulations on July 9, 1982, as an immediately effective interim rule as it is required to do under the Act in order to justify their publication less than 30 days before their effective date. 5 U.S.C. § 553(d)(3). In its July 9, 1982 publication the INS stated that it was compelled to dispense with the 30 day notice requirement as a result of Judge Spellman's decisions in *Louis v. Nelson:*

"On June 18, 1982, the District Court for the Southern District of Florida held that the Service's present detention policy in regard to aliens who attempt to enter the United States illegally was 'null and void.' In its decision, *Louis v. Nelson,* No. 81–1260–CIV–EPS [544 F.Supp. 973], the Court found that the Service had not complied with the rule making provisions of the [Act] with respect to its detention policy. The court enjoined the enforcement of this policy with respect to those Haitians who were then detained in the United States.

"In its subsequent order of July 2, 1982, the court stayed for 30 days that portion of its order which enjoined enforcement of the detention policy with respect to future illegal entrants into the United States. The court expressly conditioned the stay of its order with respect to future illegal entrants upon the Service's publication within a 30 days period of rules embodying the Service's detention policy.

"This rule is therefore being published in compliance with and consistently with the court's order, although the Service strongly disagrees with the analysis and conclusions of the court, strongly disagrees that the Service's detention policy is subject to and falls within the Act's rule making requirements, and strongly disagrees that its detention policy is null and void because the Service did not engage in formal Act rule making. Accordingly, this rule is being published 'under protest.' The Service has sought judicial review of this order."

47 Fed.Reg. at 30044. With respect to its decision to publish the regulations as an immediately effective interim rule and the "good cause" justifying that decision, the INS stated:

"This rule is being published as an interim rule with comment, effect immediately upon publication, because the delays involved in customary publication would seriously impair the Service's ability to protect the country's borders and would be detrimental to the public interest. Accordingly, suspension of the normal 30 day publication requirement is essential under the 'good cause' provision of 5 U.S.C. 553(d)(3).

"The district court's order has created a vacuum in the Service's detention policy and the enforcement of the immigration laws of the United States. This vacuum will be prolonged unless the 30 day publication requirment is suspended. If this requirement is not suspended, a significant number of persons who were previously deterred from attempting to enter the United States illegally by the Service's detention policy may now enter the United States without fear of being detained until publication is completed.

"This potential emergency was expressly recognized by the district court in its July 2, 1982 order, where the court re-

ferred to the affidavit of Bob Graham, the Governor of Florida, as follows:

"The affidavit ... states that there are between 20,000 and 40,000 Haitians in the Bahamas as well as 'additional numbers of Haitians, Nicaraguans, El Salvadorans and other nationals currently residing in other areas within the Caribbean basin.... Consistent with the information obtained from the aforesaid reports your affiant fears a renewed influx of Haitian and other aliens into south Florida if the court's judgment dated June 29, 1982 is not stayed....' "

"The court recognizes the validity of this assessment in its July 2, 1982 order at page 3:

"The appearance of an inability on behalf of the United States Government to control unlawful immigration into this country is 'the greatest inducement to the ultimate swollen tide of undocumented aliens.' *Haitian Refugee Center v. Smith,* No. 80–5683, slip op. 15182 n. 11 [676 F.2d 1023] (11th Cir. May 4, 1982). This Court does not want its Final Judgment to render INS helpless and thereby induce further migration to these shores."

"Publication of this rule as an interim rule is therefore the only possible course of action for the Service to follow in discharging its obligation to enforce the immigration laws of the United States."

*Id.*

In granting the INS' motion for a partial stay of his June 18, 1982 order, Judge Spellman in fact expressly authorized the INS to proceed as it did in promulgating the regulations, stating:

"The Defendants shall publish notice of their intent to engage in rulemaking with regard to detention as soon as possible and in no event later than thirty (30) days from the date of this Order. Said notice shall invite comments, as provided for in Title 5 of the United States Code, but Defendants are not precluded from publishing notice pursuant to section 553(b)(3)(B), (d)(3). In other words the Defendants may utilize the good cause provisions of section (d)(3) if, in their discretion, they believe it to be necessary, but they must, within the time period established, institute notice and comment rulemaking."

*Louis v. Nelson,* No. 81–1260, slip op. at 3–4 (S.D.Fla. July 2, 1982).

The INS then availed itself of the provisions of § 553(d)(3) and published the regulations as an immediately effective interim rule without 30 days notice, but provided for a subsequent 30 day comment period, closing on August 9, 1982, 47 Fed.Reg. at 30044, instituting the full range of statutory notice and comment rulemaking procedures for the promulgation of permanent rules before adopting the regulations, with amendments, as a final rule on October 19, 1982.[5]

█ I conclude that, in proceeding as it did in promulgating the regulations at issue in a two-step process, the INS acted in conformity with § 553 of the Act. The decision of the Court of Appeals for the D.C. Circuit in *American Federation of Government Employees v. Block,* 655 F.2d 1153 (D.C.Cir.1981), is particularly instructive on this question. In *Block,* plaintiffs challenged the USDA's promulgation of regulations establishing uniform poultry inspection rates on the ground that, *inter alia,* they had improperly been made immediately effective upon their initial publica-

---

**5.** Although Judge Spellman referred to § 553(b)(3)(B) of the Act, which affords an exception to the full panoply of notice and comment rulemaking procedures "when the agency for good cause finds ... that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest," as well as to § 553(d)(3), which affords an exception only to the requirement that "publication or service of a substantive rule shall be made not less than 30 days before its effective date," the INS chose to provide notice and an opportunity for subsequent comment under § 553(d)(3) and did not seek to avail itself of § 553(b)(3)(B) to escape public rulemaking entirely. The issue to be resolved here is, accordingly, limited to whether implementation of the regulations should have been delayed for at least 30 days or whether there was "good cause" to dispense with this requirement.

tion in the Federal Register. These regulations had been issued pursuant to an order of the United States District Court for the Eastern District of Arkansas in a suit against the USDA commenced by certain Arkansas poultry processors and the Arkansas Attorney General voiding a "status quo order" previously issued by USDA directing the USDA to use uniform inspection rate standards. As the Court of Appeals noted, the USDA was, on April 3, 1979, "ordered *forthwith* to use uniform inspection standards...' " 655 F.2d at 1157. The USDA then published the regulations at issue in the Federal Register on April 13, 1979, "promulgating them as final and immediately effective." *Id.* The Court of Appeals ruled that "the promulgation of emergency regulations by the [USDA] was a reasonable and perhaps inevitable response to the injunctive court order issued on April 3," adding:

> "Although the trial judge indicated that he was only voiding the status quo order and was not mandating the action to be taken by the Department to comply with his injunction, the absence of specific and immediate guidance from the Department in the form of new standards would have forced reliance by the Department upon antiquated guidelines, thereby creating confusion among field administrators, and caused economic harm and disruption to those northeastern processors

whose inspection lines ran at varying speeds. This harm would not have been limited to those within the broiler industry but would have extended in all likelihood to the consumer in the form of poultry shortages or increases in consumer prices. We believe that the issuance of emergency regulations to ameliorate this expected harm and, at the same time, to comply with the court order did not violate section 553 of the [Act]."

*Id.*[6]

By proceeding as it did here, promulgating an immediately effective interim rule and following it with a 30 day notice and comment period and the adoption of a final rule, amended in light of the public comments received, the INS fully discharged its obligations under § 553 of the Act. In light of Judge Spellman's order explicitly instructing the INS to engage in rulemaking with regard to alien detention within 30 days and advising it that it could invoke § 553(d)(3) if it believed it to be necessary, as well as the circumstances involving ongoing illegal entry into the United States identified by the INS on July 9, 1982, the INS had "good cause" to dispense with the statutory 30 day lag period between publication and effectiveness. By then allowing the public 30 days to comment on the interim rule published on July 9, 1982, amend-

---

**6.** At the same time, however, the Court of Appeals ruled that the USDA had failed to offer "any justification for the issuance of *permanent* regulations of this breadth in response to this situation." *Id.* This ruling was precipitated by the fact that, in distinction to what the INS did in the instant case, the USDA in *Block* "claimed for the both regulations that there emergency nature constituted good cause to forego 'notice and other public procedure,'" *id.*, entirely and, after their publication as an immediately effective rule, proceeded only to solicit written or oral comments for a period of 90 days without ever taking any further administrative action. In essence, whereas the INS here adopted the inadmissible alien detention and parole regulations as an immediately effective interim rule and then completed the full range of notice and comment rulemaking procedures prior to their adoption as amended as a final rule, the USDA in *Block* adopted its regulations in one step as a final rule allowing the public to participate in

the rulemaking process only through its *post hoc* comments. This procedure led the Court of Appeals to state:

> "[W]e hold only that detailed regulations which respond—as these do—to much more than the exigencies of the moment must be promulgated before they are chiseled into bureaucratic stone.... [O]nce an emergency situation has been eased by the promulgation of interim rules, it is crucial that the comprehensive permanent regulations which follow emerge as a result of the congressionally mandated policy of affording public particpation that is embodied in section 553."

655 F.2d at 1157–58.

The court concluded that the USDA "could have reconciled the statutory commands of the [Act] with the judicial command embodied in the [district court's] injunctive order by promulgating these regulations and instituting notice-and-comment procedures for the promulgation of permanent rules." 655 F.2d at 1159.

ing the rule in light of the comments received and publishing a final rule on October 19, 1982, the INS followed the course prescribed by the Court of Appeals in *Block.*

Petitioners further contend that publication of the regulations was defective because it failed to include the regulatory flexibility analysis required under 5 U.S.C. § 603 and failed to comply with Executive Order 12291. Section 603(a) of the Act provides in pertinent part that "[w]henever an agency is required by section 553 of this title ... to publish general notice of proposed rulemaking for any proposed rule, the agency shall prepare and make available for public comment an initial regulatory flexibility analysis [which] shall describe the impact of the proposed rule on small entities." 5 U.S.C. § 603(a). Petitioners complain that neither the July 9, 1982, nor the October 19, 1982, publication of the regulations complied with this requirement. Pursuant to § 611(b) of the Act, however, "[a]ny regulatory flexibility analysis prepared under sections 603 and 604 of this title and the compliance or noncompliance of the agency with the provisions of [chapter 6 of the Act are] not ... subject to judicial review." 5 U.S.C. § 611(b).

Executive Order 12291, effective February 17, 1981, requires every agency to develop a "Regulatory Impact Analysis" for each "major rule" promulgated. 46 Fed. Reg. 13193, reprinted in 5 U.S.C.A. § 601(1982). A "major rule" is defined as "any regulation that is likely to result in: (1) An annual effect on the economy of $100 million or more; (2) A major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions; or (3) Significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States based enterprises to compete with foreign based enterprises in domestic or export markets." *Id.* Pointing to what is said to be the substantial cost of building and maintaining the detention facilities which, it is further said, will need to be built in order to have aliens detained under the regulations at issue, petitioners argue that those regulations constitute a "major rule" as defined and that, consequently, the INS' conceded failure to develop a Regulatory Impact Analysis therefor renders the regulations null and void.

■ Petitioners' argument in this regard is unavailing for two reasons. First, petitioners' contention that the regulations will require the expenditure of public monies for construction and maintenance of detention facilities to house detained aliens to such a degree as to render those regulations a "major rule" is on this record speculative and conclusory, without any factual basis or support in the record. Second, and more significantly, section 9 of the Executive Order 12291, entitled "Judicial Review," in conformity with 5 U.S.C. § 611(b), expressly provides that the order "is intended only to improve the internal management of the Federal government, and is not intended to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies, its officers or any person." *Id.* Accordingly, petitioners are without standing to attack the regulations at issue due to any alleged failure on the part of the INS to comply with this order.

■ Petitioners next assert that their detention is constitutionally infirm as a violation of their rights under the due process clause of the fifth amendment since the regulations pursuant to which they are being detained are said to violate their constitutionally protected right to petition the government for political asylum and to effect an unreasonable restraint on their liberty. While it has been held that "Congress and the executive have created ... a constitutionally protected right to petition our government for political asylum [evincing] a clear intent to grant aliens the right to submit and the opportunity to substantiate their claim for asylum," *see Haitian Refugee Center v. Smith,* 676 F.2d 1023, 1038 (5th Cir.1982); *see also Chun v. Sava,* 708 F.2d 869, 877 n. 25 (2d Cir.1983); *Nunez*

*v. Boldin,* 537 F.Supp. 578, 584–87 (S.D. Tex.1982); *Orantes-Hernandez v. Smith,* 541 F.Supp. 351 (C.D.Cal.1982), the legislative history underlying the Refugee Act of 1980—the statute to which petitioners point as the source of their right to apply for political asylum—indicates that the creation of such a right of whatever scope it may be is limited by the Attorney General's discretion in paroling detainees. As such, petitioners' argument that their prolonged detention has served to chill or otherwise detract from their right to petition for asylum must be rejected.

■ Nor do I find that petitioners' continued detention violates their liberty interests under the due process clause. As the Court of Appeals for this Circuit only recently recited:

"The Supreme Court 'has repeatedly emphasized that "over no conceivable subject is the legislative power of Congress more complete than it is over" the admission of aliens,' *Fiallo v. Bell,* 430 U.S. 787, 792 [97 S.Ct. 1473, 1478, 52 L.Ed.2d 50] (1977) (citations omitted), and that 'in the exercise of its broad power over immigration and naturalization, "Congress regularly makes rules that would be unacceptable if applied to citizens." ' *Id.* ... The limits of this legislative power are few, 'for an alien has no constitutional right to enter or remain in this country ... [and] he may be denied entrance on grounds that would be constitutionally suspect or impermissible in the context of domestic policy....' *Fiallo v. Levi,* 406 F.Supp. 162, 165 (E.D.N.Y.1975) (three-judge court), *aff'd sub nom. Fiallo v. Bell, supra.*"

*Bertrand v. Sava,* 684 F.2d 204, 211–12 (2d Cir.1982) (citations omitted). As the United States Supreme Court emphasized in *Galvan v. Press,* 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1954):

"Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government. In the enforcement of these policies, the Executive Branch of the Government must respect the procedural safeguards of due process.... But that the formulation of these policies is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government...."

*Id.* at 530–31, 74 S.Ct. at 742 (citations omitted), quoted in *Bertrand v. Sava,* 684 F.2d at 211. With respect to a claim not entirely unlike that raised here and in light of precedent indicating that "[t]he unusually broad Congressional power over the admission of aliens into the United States is reflected in the narrow construction by the courts of their own power to review the discretionary decisions of the Attorney General made pursuant to authority delegated to him by Congress," the Court of Appeals has held:

"[A]s long as the Attorney General exercises his broad discretion under 8 U.S.C. § 1182(d)(5) to determine whether unadmitted aliens may be paroled pending final determination of their applications for admission to the United States, his decision may not be challenged on the grounds that the discretion was not exercised fairly in the view of a reviewing court or that it gave too much weight to certain factors relevant to the risk of abscondence and too little to others. Indeed, section 1182(d)(5) permits the Attorney General to deny parole to all or to certain groups of unadmitted aliens on the ground that he finds no emergent or public interest reasons justifying their release on parole. The discretion may not be exercised to discriminate invidiously against a particular race or group or to depart without rational explanation from establishing policies. *See Wong Wing Hang v. Immigration and Naturalization Service,* 360 F.2d 715, 719 (2d Cir.1966). Such exercise of the power would not be "legitimate and bona fide" within the meaning of *Kleindienst v. Mandel* [, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) ]. But the Attorney General's exercise of his broad discre-

tionary power must be viewed at the outset as presumptively legitimate and bona fide in the absence of strong proof to the contrary. The burden of proving that discretion was not exercised or was exercised irrationally or in bad faith is a heavy one and rests at all times on the unadmitted alien challenging denial of parole. *See Pierre v. United States,* [547 F.2d 1281, 1289 (5th Cir.) *(en banc), vacated and remanded to consider mootness,* 434 U.S. 962 [98 S.Ct. 498, 54 L.Ed.2d 447] (1977) ]."

684 F.2d at 212.

■ Petitioners have made no showing that the Attorney General's discretion was not exercised or was exercised irrationally or in bad faith. In this connection, it is important to note that petitioners' detention is by no means of an indefinite duration since, if their asylum applications are denied and exclusion proceedings against them conclude with orders being issued against them, petitioners will, as the Assistant United States Attorney represented at oral argument on the instant motion, be released from detention in the event that those orders cannot be executed. Petitioners do not, on the present motion, dispute the accuracy of this representation; and in fact the INS has, to date, been unable to execute those deportation orders which have been issued for a number of petitioners to date and has released them.[7]

Finally, petitioners contend that their continued detention is violative of the United National Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577 ("The Protocol") and general principles of customary international law. In particular, petitioners argue that their detention violates Article 31 of The Protocol which provides in pertinent part:

"The Contracting States shall not impose penalties, on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was threatened ... enter or are present in their territory without authorization, provided they present themselves without delay to the authorities or show good cause for their illegal entry or presence.

"The Contracting States shall not apply to the movements of such refugees restrictions other than those which are necessary and such restrictions shall not be applied until their status in the country is regularized or they obtain admission into another country. The Contracting States shall allow such refugees a reasonable period and all the necessary facilities to obtain admission into another country."

■ While petitioners contend that the detention of those among them whose asylum applications are pending constitutes a "penalty" as that term is used in Article 31 of The Protocol, it is clearly intended to be a "restriction on movement." In all events, under the Court of Appeals' decision in *Bertrand v. Sava,* "[T]he Protocol affords the petitioners no rights beyond those they have under our domestic law."

---

7. Petitioners have also argued that the regulations at issue are void for vagueness. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). Petitioners cite the provision of 8 C.F.R. § 235.3(b) as impermissibly vague, contending that they fail to clearly define the standards by which an immigration officer will determine whether a person "appears ... to be inadmissible" or whether his or her documentation "appears ... to be false." Since all of the petitioners appear, on the undisputed facts on this motion, to have been detained because of false documentation and since the concept of false documentation has a well developed meaning in American jurisprudence as well as in

ordinary English usage, it can hardly be said that the regulatory standard is of such indefiniteness that those intended to apply it or to whom it applies are left to guess at the meaning of the rules pursuant to which they are to act. In all events, the Court of Appeals for this Circuit has recently reiterated the principle that Congress is to be afforded wide latitude in regulating the admission of aliens into the United States and that an alien " 'may be denied entrance on grounds that would be unacceptable if applied to citizens' " and that an alien " 'may be denied entrance on grounds that would be constitutionally suspect or impermissible in the context of domestic policy.' " *Bertrand v. Sava,* 684 F.2d at 211–12 (citations omitted). Viewed in this light, the regulations at issue are not so vague as to be constitutionally impermissible.

684 F.2d at 219. The court's holding in this regard was based on its conclusion, first articulated in *Stevic v. Sava*, 678 F.2d 401 (2d Cir.1982), that the Refugee Act of 1980 "was designed, at least in part, to bring the United States into compliance with [T]he Protocol, [such] that [T]he Protocol provisions [are] not themselves a source of rights under our law unless and until Congress implement[s] them by appropriate legislation." 684 F.2d at 218–19. A determination having been made that petitioners' detention is valid under domestic law, their claims under The Protocol are untenable.

▉ Petitioners also contend that their detention violates general principles of customary international law, citing as the sources of such principles the *Universal Declaration of Human Rights*, U.N. Doc. A/801 (1948), the *American Convention of Human Rights*, 77 Dep't of State Bull. 28 (July 4, 1977), and the *International Covenant on Civil and Political Rights*, G.A.Res. 2200A (XXI), Dec. 16, 1966, U.N.Gen.Ass.Off.Rec., 21st Sess., Supp. No. 16 (A/6316), p. 52. While international law is a part of the laws of the United States that federal courts are bound to ascertain and apply in appropriate cases, *The Nereide*, 13 U.S. (9 Cranch) 388, 3 L.Ed. 769 (1815); *The Paquete Habana*, 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900); *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir.1980), even the principles of law to which petitioners have referred the court, assuming *arguendo* that they rise to the level of general principles of customary international law to be applied in American courts, *see generally Filartiga v. Pena-Irala,* do not compel the conclusion that petitioners' detention is unlawful. Each of these international documents proscribe detention that is "arbitrary" or otherwise not in accordance with such procedures as are established by the applicable law, *see* Petitioners' Brief at 65–67. As has been noted above, petitioners' detention does not fit within either of these categories. Moreover, the cases cited by petitioners in which such general principles of customary international law were applied in connection with the claims of detained aliens, *see Rodriguez-Fernandez v. Wilkinson*, 505 F.Supp. 787 (D.Kan.1980), *aff'd*, 654 F.2d 1382 (10th Cir.1981); *Soroa-Gonzales v. Civiletti*, 515 F.Supp. 1049 (N.D.Ga.1981), are distinguishable from the instant case since each of the cited cases involved detention deemed to be indefinite. In the present case, as has already been noted, petitioners' detention is by no means indefinite.

CONCLUSION

Petitioners' application for an order granting them summary judgment and directing their immediate release is denied.

SO ORDERED.