**ASSOCIATED BUILDERS & CONTRACTORS, INC., et al., Plaintiffs,**

v.

**Alexis HERMAN, Secretary of Labor, and John Fraser, Acting Administrator of the Wage and Division, U.S. Department of Labor, Defendants.**

Civ. A. No. 96–1490(SS).

United States District Court, District of Columbia.

July 23, 1997.

Maurice Baskin, Venable, Baetjer, Howard & Civiletti, LLP, Washington, DC, for Plaintiff.

Joseph William LoBue, Sandra Marguerite Schraibman, U.S. Dept. of Justice, Washington, DC, for Defendants.

Terry Russell Yellig, Sherman, Dunn, Cohen, Leifer & Yellig, Washington, DC, for Bldg. and Construction Trades Dept.

Margaret Phillis Payne, Connerton & Ray, Washington, DC, for Laborers Int. Union of North Amer.

## MEMORANDUM OPINION

SPORKIN, District Judge.

### I.

### *Introduction*

On April 3, 1997, the above-captioned case was reassigned from the late Honorable Charles R. Richey to the undersigned member of this Court. Before the Court are the parties' cross-motions for summary judgment.

The plaintiffs ask the Court to direct the defendants[1] to re-implement and enforce revised regulations relating to the use of employees known as "helpers" on federal construction projects covered by the Davis–Bacon Act. The defendants suspended the revised helper regulations in November 1993 and reinstated the former helper regulations, because a congressional rider in an appropriations bill precluded the expenditure of any funds to implement the revised regulations; that rider, which was incorporated into subsequent appropriations measures, expired on April 26, 1996. The plaintiffs allege that the defendants' failure to implement the revised helper regulations since April 26, 1996 violates the Administrative Procedure Act and the Davis–Bacon Act. The plaintiffs further allege violations of the Unfunded Mandates Act and the Regulatory Flexibility Act. In addition to seeking injunctive relief, the plaintiffs ask the Court to declare that the revised helper regulations, as they existed prior to their suspension in November 1993, are now in effect and must be enforced. For the reasons discussed below, the defendants are entitled to judgment as a matter of law.

### II.

### *Statutory and Regulatory Background*

The Davis–Bacon Act, 40 U.S.C. § 276a, ensures that workers on federal construction projects are paid no less than prevailing wage rates in the locality of such projects. *See Building & Constr. Trades Dep't, AFL–CIO v. Martin,* 961 F.2d 269, 271 (D.C.Cir. 1992). Under the Act, the advertised specifications for each federal construction project in excess of $2,000 must contain minimum wage provisions for each class of laborer and mechanic based upon prevailing wages in the locality of performance as determined by the Secretary of Labor. *Id.*

Pursuant to the Davis–Bacon Act, the Department of Labor ("the Department") has promulgated regulations governing a class of employees known as "helpers" working on federal construction projects. Prior to 1982, the Secretary's long-standing practice was to recognize a helper classification only if: (1) it "was a separate and distinct class of worker that prevailed in the area," and (2) the proposed helper classification "perform[ed] duties that could be differentiated from the duties of journeylevel workers in the classification, as well as other classifications on the wage determination." 58 Fed.Reg. 58954.

On May 28, 1982, the Department promulgated changes to the helper regulations

---

1. The original, named defendants were Robert Reich, Secretary of Labor, and Maria Echaveste, Administrator of the Wage and Hour Division, Employment Standards Administration, U.S. Department of Labor. Since the filing of this lawsuit, both Mr. Reich and Ms. Echaveste have left the Department. Alexis Herman is now the Secretary of Labor, and John Fraser is the Department's acting Wage and Hour Administrator. Ms. Herman and Mr. Fraser are hereby substituted as party defendants pursuant to Fed.R.Civ.P. 25(d)(1).

which "represented a reversal of a long-standing Department of Labor practice by allowing some overlap between the duties of helpers, and journeyman and laborers." On January 27, 1989, after having been enjoined by the Honorable Harold Greene of this Court and partially struck down by the D.C. Circuit, the final, revised helper regulations were published in the Federal Register. 54 Fed.Reg. 4234 (Jan. 27, 1989). In 1990, the Department published a Federal Register notice implementing the revised helper regulations effective February 4, 1991. 55 Fed. Reg. 50148 (Dec. 4, 1990).

In April 1991, only two months after the revised regulations became effective, President Bush signed into law an appropriations measure that prohibited the Department from spending any funds to implement or administer the revised helper regulations. The Department complied with this measure and did not implement or administer the revised regulations for the remainder of fiscal year 1991.

After fiscal year 1991, a new appropriations act was passed which did not include a ban on the implementation of the revised helper regulations. The Department thereafter instructed all contracting agencies to include helper contract clauses in contracts covered by the Davis–Bacon Act. On June 26, 1992, after the D.C. Circuit had invalidated as arbitrary a portion of the revised helper regulations providing a 2:3 cap on the ratio of helpers to journeyman (*see Building & Constr. Trades Dep't, AFL–CIO v. Martin*, 961 F.2d 269, 277 (D.C.Cir.1992)), the Department issued a notice in the Federal Register, bringing the revised helper regulations into compliance with this decision. 57 Fed. Reg. 28776. The revised helper regulations were enforced from June 26, 1992 until November 5, 1993.

On October 21, 1993, Congress enacted another appropriations measure which, once again, prohibited the Department from expending funds to implement or administer the revised helper regulations. *See Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act*, 1994, Pub.L. No. 103–112, § 103 (Oct. 21, 1993). In response, on November 5, 1993, the Department published a Federal Register notice suspending the revised helper regulations and re-instituting the Department's longstanding regulations governing the use of helpers. 58 Fed.Reg. 58954 This notice stated, in relevant part:

> [T]he regulations presently codified at 29 CFR 1.7(d), 5.2(n)(4), and 5.5(a)(1)(ii) [the revised helper regulations] are suspended until the Department of Labor publishes notice in the Federal Register that prohibition on implementation of the regulations has been lifted.

*Id.* Invoking section 553(b)(3)(B) of the APA, the notice further stated that there was "good cause for dispensing with notice and public comment concerning the suspension" of the revised helper regulations, due to the prohibition contained in the appropriations measure. *Id.* at 58955. The suspension of the revised helper regulations affected all contracts awarded on or after October 21, 1993.

The 1995 Department of Labor Appropriations Act also barred the Department from expending funds to implement the helper regulations; this prohibition extended into fiscal year 1996 through several continuing resolutions.

As the Department recognized in its Federal Register notice of August 2, 1996, the Department's fiscal year 1996 appropriations contains no prohibition on the expenditure of the funds to carry out and enforce the revised helper regulations:

> There is no such prohibition in the Department of Labor's Appropriations Act for fiscal year 1996, Public Law 104–134, signed into law by President Clinton on April 26, 1996

61 Fed.Reg. 40366, 40367.

In that same August 2 notice, the Department published a proposed rule, seeking comment on whether the suspension of the revised helper regulations should continue while the Department "conducts additional rulemaking proceedings to determine whether further amendments should be made to those regulations." *Id.* The August 2 notice did not solicit comments on the substance of the revised helper regulations. It cited no

specific provisions of the revised helper regulations that it intends to subject to substantive rulemaking, nor did it propose any changes to the suspended helper regulations. Rather, the Department sought comment only on the propriety of continuing the suspension of the revised regulations, pending another notice and comment period of indefinite duration on the actual substance of the revised helper regulations.

According to the August 2 notice, during the two-and-a-half years in which the revised regulations were suspended, "additional information" had become available, warranting review of the suspended rule. This information included: (1) 78 prevailing wage surveys conducted over a 21 month period when the revised regulations were in effect in 1992 and 1993; (2) the Department's "concern[ ] that the helper regulation may create an unwarranted potential for abuse of the helper classification to justify payment of wages which are less than the prevailing wage in the area," because the D.C. Circuit had invalidated the 2:3 helper to journeyman ratio cap;[2] (3) the Department's "concern[ ] about the possible impact of the helper regulations on formal apprenticeship and training programs," and (4) the Department's "preliminar[y] view" that implementation of the revised helper regulations "on a short-term basis would create unwarranted disruption and uncertainty for both federal agencies and the contracting community" by requiring conformances in new contracts and government procurement regulations and by requiring the Department to determine that the use of helpers is the prevailing practice in a particular job classification in the area in which the work will be performed. *Id.* at 40367–68.

The Department's principal concern was that "the suspended [helper] regulation would be fully effective for only a brief period, if at all, before the Department expects it would complete substantive rulemaking proceedings to consider amending the regulation." *Id.* at 40368 Further, "repeated changes in the regulations within a short period of time would create unwarranted disruption in the contracting process of federal agencies which would be required to amend their regulations and contract forms on an interim basis only to repeat the entire process if proposed amendments to the helper regulations are finalized." *Id.* Finally, the Department would be forced to divert resources away from its planned substantive rulemaking on the use of helpers in order to collect prevailing practice and wage data which would be needed to implement the suspended helper regulations. *Id.*

On December 30, 1996, the Department issued a final rule providing that the revised helper regulations would remain suspended while the Department conducts additional rulemaking proceedings to determine whether further amendments should be made to those regulations. *See* 61 Fed.Reg. 68641 The Department based its decision on the reasons outlined in its August 2 notice of proposed rulemaking.

## III.

### Discussion

A. *The Propriety of the Original Suspension of the Helper Regulations in November 1993.*

Section 553 of the APA prescribes the general notice and comment procedures an agency must follow when promulgating a rule. Under the APA, an agency must publish notice of a proposed rule in the Federal Register and allow interested parties to submit comments on the proposed rule. 5 U.S.C. § 553 (1996).

The APA contains an exception to these procedures, however. An agency may suspend general notice and comment procedures if the agency "for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B).

▮ In this Circuit, the "good cause" or "emergency" exception to the APA's notice and comment requirement is "narrowly construed and only reluctantly countenanced."

2. The ratio cap is discussed in subsection III. C.2., *infra.*

**6**

State of New Jersey, Dep't of Envtl. Protection v. U.S. E.P.A., 626 F.2d 1038, 1045 (D.C.Cir.1980). It is not an " 'escape clause[]' that may be arbitrarily utilized at the agency's whim." Am. Fed'n of Gov't Employees, AFL–CIO v. Block, 655 F.2d 1153, 1156 (D.C.Cir.1981) (quoting S.Rep. No. 752, 79th Cong., 1st Sess. (1945)). Thus, use of the "good cause" exception should be limited to "emergency" situations. AFGE v. Block, 655 F.2d at 1156. Moreover, the emergency regulations should be limited in temporal scope, responding to no "more than the exigencies of the moment." Id. at 1157.

The plaintiffs do not dispute the defendants' contention the Department had "good cause" to suspend the helper regulations in November 1993, when Congress prohibited the Department from expending funds to implement or administer them. Thus, the Court shall assume, arguendo, that "good cause" existed to suspend the regulations without the opportunity for a comment period in November 1993. See, e.g., AFGE v. Block, 655 F.2d at 1157 (finding that the agency had good cause to issue emergency regulations in response to a court order).

B. *Even if the Defendants Were Required to Re–Implement the Revised Helper Regulations on April 26, 1996. any APA Claim Based on Their Failure to Do So Is Now Moot.*

■ Given that the defendants had good cause to suspend the revised helper regulations in November 1993, the next question is whether the suspension of these regulations remained valid once the emergency—the congressional prohibition—expired on April 26, 1996. The plaintiffs argue that the defendants were "compelled" to re-implement the suspended helper regulations immediately, on April 26, 1996, because there was no longer a statutory obstacle to their enforcement, the "emergency" which previously had justified suspension of the revised helper regulations no longer existed.[3]

The parties have not directed the Court to a case squarely on point with the instant one. However, the Court finds that a pair of cases from our circuit—National Treasury Employees Union, AFL–CIO v. Devine, 733 F.2d 114 (D.C.Cir.1984) and American Fed'n of Gov't Employees, AFL–CIO v. Office of Personnel Management, 821 F.2d 761

---

3. The plaintiffs argue in the alternative that the defendants were compelled to re-implement the suspended regulations by no later than August 2, 1996. The plaintiffs base their argument on Judge Richey's order of December 10, 1996. In that order, Judge Richey observed that (1) the defendants' November 5, 1993 Federal Register notice that suspended the revised helper regulations had indicated that these regulations would remain suspended "until the Department of Labor publishes notice in the Federal Register that the prohibition on implementation of the regulations has been lifted" (58 Fed.Reg. 58954) and (2) language in the Background section of the defendants' August 2, 1996 Federal Register notice acknowledged that the prohibition had been lifted (61 Fed.Reg. 40366). Judge Richey asked the parties to brief the issue of whether the condition precedent to re-implementation of the revised helper regulations—publication of the expiration of the congressional prohibition in the Federal Register—had been satisfied by this language in the August 2 notice.

Contrary to the representation made in the plaintiffs' brief, Judge Richey never adopted the plaintiffs' position that the 1993 suspension expired upon the publication of the August 2, 1996 notice. Indeed, the August 2, 1996 notice, which set forth only a proposed rule on continuing the suspension of the helper regulations, could not

have re-implemented the suspended helper regulations as a final rule, as a matter of law. See Rowell v. Andrus, 631 F.2d 699, 702 (10th Cir. 1980) (holding that the APA's requirement that a substantive rule be published not less than 30 days before its effective date (5 U.S.C. § 553(d)) is "not satisfied by the publication of 'general notice of proposed rulemaking' "). Among other things, the August 2 notice lacked a clear and precise statement that the revised helper regulations were in effect, as well as an effective date for their re-implementation. See Natural Resources Defense Council v. U.S. Envtl. Protection Agency, 683 F.2d 752, 762 (3rd Cir.1982) (holding that an effective date is an essential part of any rule). Affected members of the public had no idea whether, and, if so, when the revised helper regulations were to be implemented. See Paralyzed Veterans of Am. v. D.C. Arena L.P., 117 F.3d 579, 584 (D.C.Cir. 1997) ("A substantive regulation must have sufficient content and definitiveness as to be a meaningful exercise in agency lawmaking. It is certainly not open to an agency to promulgate mush ..."); see also 1 C.F.R. § 21.20(a) (requiring all amendments to federal regulations to be made with specificity). Consequently, without more, the passing reference to a congressional enactment in the Background section of the August 2 notice could not have effectuated a re-implementation of the suspended helper regulations.

(D.C.Cir.1987)—strongly suggest that the defendants were required to begin the process of re-implementing the revised helper regulations on April 26, 1996. At issue in *Devine and AFGE v. OPM* were personnel regulations promulgated by the Office of Personnel Management's ("OPM"). As in this case, Congress had enacted an appropriations measure specifying that no funds could be obligated or expended to implement, promulgate, administer or enforce particular regulations. *Devine*, 733 F.2d at 115–16.

The D.C. Circuit "emphasize[d] the finite nature of the congressional prohibition" on the OPM regulations, because there was "no suggestion in the [statutory] language ... that Congress intended to bar implementation of the regulations beyond the period during which OPM receives funds through [the appropriations measure]." *Id.* at 120. Thus, when OPM no longer derived its funding from that measure, it would be "free to take any steps deemed necessary to implement, administer and enforce the regulations." *Id.*

This is exactly what OPM did. The rider prohibiting OPM from expending funds to implement the regulations expired in July 1985, whereupon OPM immediately implemented them, precipitating another lawsuit. *AFGE v. OPM*, 821 F.2d at 763. Unions representing federal employees claimed that immediate implementation was unlawful, because OPM had failed to provide new notice and an opportunity for additional comment after the rider's expiration. *Id.* at 764. The Court of Appeals rejected this claim, holding:

> "Since OPM had already completed notice and comment proceedings, and in fact had published the rules in final form just two days before Congress imposed its ban, ... implementation could be and was virtually *automatic* once the ban expired ... [I]t was (or should have been) quite clear to everyone familiar with the rulemaking process that the rules were subject to implementation *immediately* upon expiration of the ban."

*Id.* (emphasis added).

As in *AFGE v. OPM*, it was (or should have been) quite clear to everyone familiar with the helper regulations that the revised regulations were subject to implementation immediately upon expiration of the congressional rider prohibiting the expenditure of funds to implement them. The congressional prohibition was the "raison d'etre" of the suspension. When the prohibition expired, there was no longer an obstacle to enforcement of the duly-promulgated, revised helper regulations, even if those regulations were "obsolete" in some respect. *AFGE v. OPM*, 821 F.2d at 764. Thus, on April 26, 1996, the Department was required to take the necessary steps to implement the revised helper regulations, absent a continuation of the congressional prohibition or other "good cause" circumstances that would have justified the continuation of the suspension without notice and an opportunity for comment.

One of those necessary steps was the publication in the Federal Register of an effective date for re-implementation of the revised helper regulations; to have the force of law, a substantive rule must have an effective date. *See Environmental Defense Fund, Inc. v. Gorsuch*, 713 F.2d 802, 815–16 (D.C.Cir.1983). The defendants never published an effective date for the revised helper regulations. However, on August 2, 1996, the Department published a proposed rule, seeking comment on whether the suspension of the revised helper regulations should continue while the Department conducts additional rulemaking proceedings to determine whether further amendments should be made to those regulations. In essence, the Department published a proposed rule indefinitely postponing the effective date of the revised helper regulations while it substantively re-examines the revised helper regulations.

The plaintiffs argue that this action did not fulfill the Department's obligations under the APA, because the Department's only option was immediate implementation of the revised helper regulations—in other words, publication of notice in the Federal Register that the revised helper regulations were in effect as of April 26, 1996. In support of their argument, the plaintiffs rely principally upon Justice Powell's concurring opinion in *Interstate Commerce Comm'n v. Oregon Pacific Ind.*, 420 U.S. 184, 95 S.Ct. 909, 43 L.Ed.2d 121 (1975). There, Justice Powell states that

"the justification for summary action ends with the emergency that called it forth." *Id.* at 192–93, 95 S.Ct. at 915. It purportedly follows from this statement that the Department's only option was to make the revised helper regulations effective immediately.

The Court disagrees. The plaintiffs fail to point out that Justice Powell further recommends that, after the emergency, the agency next should "determine what changes, if any, are required" to the suspended rules, not necessarily that the agency return to the status quo before the suspension. The Department acted consistently with Justice Powell's recommendation.

Two-and-a-half years passed between the suspension of the revised helper regulations and the expiration of the congressional ban. During this time, the defendants had collected new data on the prevailing employment of helpers. According to the defendants, this new data seriously undermined a key assumption underlying the development of the revised helper regulations, thereby creating substantial doubt about whether these regulations would result in the previously-projected cost-savings on federal construction projects. Further, it was the defendants' view that re-implementation of the revised helper regulations would require many months, because (1) any effective date would be at least 60 days from the date of publication of a new rule, (2) it would take an additional 30 to 60 days for contracts containing helper contract clauses to be signed, (3) it could take as many as ten months for government procurement regulations and standard contract forms to be amended, and (4) the Department still would have to conduct prevailing wage practice surveys in order for contractors to use helpers in accordance with the revised helper regulations. The Department concluded that it would not make sense to go through the costly and cumbersome process of re-implementation, if the future, substantive rulemaking reveals that the revised helper regulations are not even necessary. Thus, assuming these factual findings had a rational basis,[4] the Department acted in accordance with Justice Powell's recommendation by soliciting comments on the propriety of postponing the effective date of the revised helper regulations in order to "determine what changes, if any, are required."

Moreover, a *per se* rule that required the Department to set an immediate effective date for the revised helper regulations would be inconsistent with the APA. The Department was not required to ignore changed circumstances, new concerns, or new information that it discovered in the two-and-a-half years since the regulations were last implemented, especially when this new information suggests that *one of* the fundamental bases of the revised helper regulations (the widespread use of helpers) no longer holds true. Therefore, assuming a rational basis for the Department's findings, not only was it committed to the Department's discretion to seek an indefinite postponement of the effective date, it arguably was its duty to so. *See National Ass'n for the Advancement of Colored People v. Federal Communications Comm'n,* 682 F.2d 993, 998 (D.C.Cir.1982) (holding that deference is owed to an agency's determination that circumstances have changed and to the agency's response thereto); *Geller v. Federal Communications Comm'n,* 610 F.2d 973, 980 (D.C.Cir.1979) (holding that the agency was required to re-examine regulations where the rationale for their adoption no longer existed due to changed circumstances).

While the Department waited three months after expiration of the congressional ban before publishing any notice regarding a new effective date (resulting in an unlawful postponement of the effective date of the revised helper regulations), an APA claim attacking that delay is now moot. The defendants cured that APA violation by (1) issuing a notice of proposed rule-making on August 2, 1996 as to whether the effective date for the revised helper regulations should be postponed while the DOL conducts additional rulemaking, (2) affording the plaintiffs an opportunity to comment on the proposed rule, and (3) adopting this proposed indefinite suspension of the effective date as a final rule on December 30, 1996.

---

4. This issue is addressed in section III.C., *infra.*

The procedural harm the plaintiffs suffered was their inability to comment on the propriety of continuing the suspension past April 26, 1996. However, the plaintiffs had the opportunity to comment on this subject during the August 2, 1996 rule-making which culminated in the December 30 final rule. Thus, even though the plaintiff's attack on the continued suspension of the helper regulations past April 26, 1996 originally was well-founded, the Court can hardly order the defendants at this point to do something they already have done, namely, provide the plaintiffs the opportunity to comment on a further suspension of the effective date of the revised helper regulations. *See Natural Resources Defense Council v. United States Nuclear Regulatory Comm'n,* 680 F.2d 810, 814 (D.C.Cir.1982) (holding that an agency's re-promulgation of a rule with notice and an opportunity for comment mooted a lawsuit challenging the validity of the original rule promulgated without notice or comment); *accord Save Our Cumberland Mountains v. Watt,* 558 F.Supp. 22, 23 (D.D.C.1982) (Richey, J.) (holding that the claim that the Department of the Interior had "improperly suspended and later withdrew a duly promulgated regulation" in violation of the APA was moot "because defendants have since promulgated a new government regulation in strict compliance" with the APA), *aff'd sub nom. Save Our Cumberland Mountains v. Clark,* 725 F.2d 1422 (D.C.Cir.), *reh'g granted and panel opinion vacated* (1984); *see also See Save Our Cumberland Mountains v. Clark,* 725 F.2d at 1432–33 (rejecting the plaintiffs' argument that reinstating the unlawfully suspended rule which had been superseded by a properly promulgated rule represented an additional form of relief that precluded dismissal of their APA claim on mootness grounds, because the plaintiffs' injury was the loss of opportunity to participate in the rulemaking, an opportunity the plaintiffs eventually received).

The plaintiffs disagree, pointing to the Third Circuit's decision in *Natural Resources Defense Council v. U.S. Environmental Protection Agency,* 683 F.2d 752 (3rd Cir.1982).[5] In that case, the EPA had suspended indefinitely, and without notice and comment, the effective date of final regulations dealing with the discharge of toxic pollutants into publicly owned treatment works ("POTW regulations"). EPA justified the lack of prior notice and comment by reference to an Executive Order that required so-called "major rules" to be accompanied by a Regulatory Impact Analysis before they could be implemented.

About six months after suspending the POTW regulations, EPA published two notices in the Federal Register, one setting an effective date for implementation of the regulations, and the other seeking comment on whether the effective date should be further suspended. After receiving comments on the continued suspension, EPA published an order that all of the amendments to the POTW regulations would be implemented, except for four, which would remain suspended pending further analysis.

The Third Circuit held that EPA's indefinite postponement of the POTW regulations was a rule subject to the rulemaking procedure of the APA. *Id.* at 764. It further held that the Executive Order did not provide EPA with good cause to suspend the regulations without notice and comment *Id.* at 765. Consequently, EPA had violated the APA when it initially had suspended the POTW regulations *Id.* at 767

EPA nevertheless contended that NRDC was not entitled to a remedy (i.e., their claim regarding the four amendments was moot),[6] because notice and comment procedures were held in connection with the proposed rule to continue the postponement of the four amendments, and those procedures (in which NRDC had participated) cured any defect in the initial postponement. *Id.* at 768. The Third Circuit disagreed, because the initial

---

5. By order of February 6, 1997, the Court directed the parties to address the reasoning and holding in this case.

6. The Court noted that the NRDC's case regarding the other amendments to the POTW regula-

tions "may well be moot" because they were in effect at the time of judicial review, and none of them had a specific compliance date or triggered further compliance obligations by becoming effective *Id.* at 759 n. 15.

postponement had violated the APA, and while EPA "conduct[ed] a rulemaking on the question of whether its already accomplished postponement should be continued . . ., that rulemaking [could not] replace one on the question of whether the amendments should be postponed in the first place." *Id.* Thus, if the suspended amendments to the POTW regulations properly had gone into effect, "the question to be decided in the [subsequent] rulemaking would have been whether the amendments, which had been in effect for some time, should be suspended, and not whether they should be further postponed." *Id.* at 768.

The Court finds this Third Circuit case to be inapposite, because EPA's initial postponement of the POTW regulations violated the APA, an unlawful action that tainted the subsequent rulemaking on a further postponement. Here, by contrast, there is no dispute that the defendants had good cause initially to suspend the helper regulations due to the congressional prohibition on their implementation. Thus, the defendants' rulemaking regarding a continued suspension was not similarly tainted.[7]

The Third Circuit also noted that the NRDC's case would have been moot if putting it in the position it would have occupied absent EPA's APA violation would not have altered "the status quo, as it exists today

. . ." *Id.* at 759. The Court found that the NRDC's case was not moot, because, absent EPA's unlawful suspension of the POTW regulations, the four amendments would have been in effect for over a year, based on the effective date EPA previously had set for the regulations just prior to their unlawful suspension. *Id.* Therefore, retroactive reinstatement of the unlawfully suspended POTW regulations would alter the status quo, because (1) the four amendments immediately would go into effect and (2) other compliance obligations, which were temporally-linked to the effective date of these four amendments, also would be triggered. *Id;* compare *id.* at 759 n. 15 (noting that the NRDC's "case may well be moot" as to the other amendments, because none had a specific compliance date).

Here, by contrast, the defendants never published an effective date for re-implementation of the revised helper regulations. This Court cannot order retroactive implementation of the revised helper regulations, because there is no date upon which they *lawfully*[8] were to become effective. Since the defendants already have completed a rulemaking on a proper effective date, there is no relief this Court could order that would alter the status quo for the plaintiffs. The plaintiffs' procedural challenge under the APA is now moot.[9]

---

7. For the same reason, *Air Transport Ass'n of Am. v. Department of Transp.,* 900 F.2d 369 (D.C.Cir.1990) is inapposite. In that case, the FAA, without notice and comment, promulgated rules establishing a comprehensive adjudicatory scheme to punish violations of aviation safety standards. The D.C. Circuit held that the FAA could not rely on the good cause exception to excuse their non-compliance with the notice and comment requirement of the APA. *Id.* at 379. The Court further held the FAA's solicitation of post-promulgation comments did not cure the initial APA violation, because the FAA had failed to overcome the presumption that had it entertained the comments before promulgating the final rules, it might have adopted a different rule. *Id.* at 380–81. The instant case is distinguishable, because there is no dispute that the defendants' initial reliance on the good cause exception comported with the APA. Thus, unlike the FAA's conduct, the defendants' APA violation was not an improperly-promulgated rule, but rather their failure to take timely steps to establish a new effective date (or conduct rulemaking on an appropriate effective date) for the revised

helper regulations. The defendants have cured any harm that plaintiffs experienced as a result of this delay.

8. As the Third Circuit noted, an effective date is an essential part of any rule. *Natural Resources Defense Council,* 683 F.2d at 762.

9. Even if this Court were to invalidate the December 30 final rule indefinitely continuing the effective date of the revised helper regulations because it was not the product of reasoned decisionmaking, immediate re-implementation of these regulations is not necessarily the appropriate remedy. It would be within the Court's discretion to delay the effective date of the revised helper regulations for a period of time, during which the Department could consider whether to amend the substance of the revised helper regulations, or, in order to provide time for sufficient consideration, whether to postpone the effective date further. *See Consumer Energy Council of Am. v. Federal Energy Regulatory Comm'n,* 673 F.2d 425, 479 (D.C.Cir.1982) (delaying effectiveness of improperly-revoked rule for thirty days

C. *The December 30, 1996 Final Rule Is Not Arbitrary, Capricious or an Abuse of Discretion*

The remaining APA question, then, is whether the Department's indefinite suspension of the effective date of the revised helper regulations was arbitrary or unreasonable. *See National Ass'n of Independent Television Producers and Distributors v. F.C.C.*, 502 F.2d 249, 254 (2nd Cir.1974) (holding that an effective date cannot be "arbitrary or unreasonable").[10]

As mentioned above, the at-issue rule provides that the revised helper regulations will remain suspended while the Department conducts additional rulemaking proceedings to determine whether further amendments should be made to those regulations. 61 Fed.Reg. 68641. The revised helper regulations have *not* been repealed or amended.

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (*quoting Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962)). The Court must ensure only that the Department "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " *Id.*

The defendants argue that they postponed the effective date of the revised helper regulations pending the outcome of substantive rulemaking, because "repeated changes in the regulations within a short period of time would create an unwarranted disruption in the contracting process of federal agencies and uncertainty in the contracting community as a whole." 61 Fed.Reg. at 68643. In the final rule, they explain that implementation of the helper regulations is a lengthy and cumbersome process which requires corresponding modifications in federal procurement regulations and contract forms such that "the suspended [helper] regulation, if immediately implemented, would be effective for only a brief period, if at all, before the Department expects [to] complete substantive rulemaking proceedings." *Id.*

During the comment period on this rule, the Department received three comments concerning the proposed temporary continuation of the suspension. The comment from the Building and Construction Trades Department, AFL–CIO agreed that the continuation of the suspension was the most prudent course. Comments from the Associated General Contractors of America and plaintiff Associated Builders and Contractors took the contrary position, essentially arguing that any delays in implementation should be "minimal" and no more than 60 days.

When it published the final rule, the Department responded that its past experience with the revised helper regulations proved otherwise. *See* 61 Fed.Reg. at 68642–43. If the revised helper regulations were implemented immediately, the Department would have to provide at least a 60–day effective date to allow affected parties to come into compliance. Following the effective date, there would be another period (possibly as long as 60 days) before contracts containing helper contract clauses could be signed. Additionally, when the helper regulations were last implemented in 1992, government procurement regulations and standard contract forms had to be amended, a process that took approximately ten months after the Department issued notice implementing the rule. Immediate implementation also would require the Department to perform wage determination and prevailing wage practice surveys in order for contractors to use helpers in accordance with the helper regulations, further lengthening the time period

---

during which "the Commission may consider whether to amend the substance of the rule or, in order to provide time for sufficient consideration, whether to postpone the effective date further"). Since the Department presently is following this procedure through the December 30 rule, a Court order to the same effect would be redundant.

**10.** The "arbitrary or unreasonable" standard is simply another way of determining whether the agency action at issue was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

before contractors could lawfully pay workers at helper rates. Finally, the Department intends to complete a substantive rulemaking action on the helper regulations, and therefore, immediate implementation of the revised helper regulations would lead to disruption and uncertainty in the contracting community and in the contracting process of federal agencies.

The plaintiffs have proffered little evidence that these logistical reasons for the Department's decision to delay implementation of the revised helper regulations are arbitrary and capricious. Instead, they have attacked the Department's decision to re-examine the helper regulations in the first place. The plaintiffs argue that none of the reasons cited by the Department justify such re-examination, and therefore, the Department should implement the helper regulations immediately.

The Department found that re-examination was necessary, because actual experience with the suspended helper regulations during the twenty month period they were in effect cast doubt on a "key assumption underlying the Department's development of the [revised] helper regulation"—that the use of helpers is a "widespread practice" within the construction industry (*see* 47 Fed.Reg. at 23662) Moreover, there was (1) concern that the suspended helper regulations could create an unwarranted potential for abuse of the helper classification to justify payment of wages which are less than the prevailing wage in the area and (2) concern that the helper regulations would negatively impact formal apprenticeship and training programs. As discussed below, the plaintiffs have failed to show that the defendants lacked a rational connection between these concerns and the decision to continue the suspension.

1. *Whether the use of helpers is "widespread".*

In the proposed helper rule published in August 1987 (which eventually became the revised helper regulations), the Department projected that helpers prevailed in two-thirds to 100 percent of all craft classifications. 52 Fed Reg. 31366, 31369 ("[W]e find that in each region, if one helper works in associa-

tion with one journeyman, helpers prevail in two thirds of the craft classifications. If we assume that one helper works in association with two journeyman, helpers are found to prevail in all craft classifications."). Further, the Department projected that savings in construction costs stemming from such a prevalent employment of helpers would range from 451 to 610 million dollars. *Id.*

Data collected when the helper regulations were in effect in 1992 and 1993, however, showed that helpers prevail in only 69, or 3.9 percent, of the 1763 classifications included in the 78 prevailing wage surveys completed during this period. 61 Fed.Reg. at 68644. Thus, the Department questions the potential cost savings, if any, that would result from re-implementation of the revised helper regulations. Because of the "extraordinary divergences between the actual data and the projection used as a basis for adopting the helper regulations," the Department has concluded that the helper regulations should be re-examined. *Id.* at 68645.

The plaintiffs object to the Department's reliance on these 78 wage surveys, because the surveys allegedly "are a tiny fraction of the thousand of surveys performed by the Department as a whole, and there is no claim that the areas selected were representative of the construction industry according to any known statistical sampling measure." The plaintiffs, however, have submitted no real evidence showing that either the number of surveys or the specific areas targeted by the surveys were inappropriate from a statistical standpoint. Therefore, the Court has no way of confirming the plaintiffs' bald assertion that it was irrational for the Department to base certain " 'prevailing/non-prevailing' decisions ... upon reports of a few dozen or less employees in a geographic area."

The plaintiffs further claim that the Department's data was skewed because it was based on the "voluntary submissions of employers, a substantial majority of whom do not participate in Labor Department survey efforts." Again, the plaintiffs have submitted no evidence to support this assertion.

The plaintiffs' reliance on a General Accounting Office report is misplaced. That

report, entitled *Davis–Bacon Act—Process Changes Could Raise Confidence that Wage Rates Are Based on Accurate Data*, No. 96–130 (May 31, 1996), has nothing to do with helpers or surveys designed to determine whether use of helpers is the prevailing practice in a geographic area. Rather, the report focuses on potential problems in collecting and verifying wage and fringe benefit data from employers, possibly resulting in increased government construction costs or lower wages and fringe benefits being paid to construction workers. Additionally, the report never examined or verified the accuracy of any wage determination data, survey response rates, or calculations of prevailing wages. The report identified only *potential* problems with the Department's general data collection and verification procedures. Thus, the report in no way undermines the accuracy or significance of the data utilized in the 78 surveys conducted in 1992 and 1993.

Indeed, if as the plaintiffs argue, the Department's data collection practices are so flawed, then there is just as much reason *not* to re-implement the revised helper regulations, which presumably were founded on similarly-flawed data. Thus, even if the GAO Report were relevant to this case, it provides additional support for the defendants' decision to re-examine the revised helper regulations.

Nor can the plaintiffs avail themselves of the audit report prepared by the Office of Inspector General of the Department of Labor. *See* DAILY LAB. REP. at E–1 (Mar. 13, 1997). There is no dispute that the audit report was not included in the Administrative Record filed in this case. Consequently, the Court cannot rely on the audit to determine whether the defendants' actions were arbitrary and capricious. *Florida Power & Light v. Lorion*, 470 U.S. 729, 743, 105 S.Ct. 1598, 1606–07, 84 L.Ed.2d 643 (1985); *see also American Iron & Steel Institute v. Occupational Safety and Health Admin.*, 939 F.2d 975, 1010 (D.C.Cir.1991) (holding that reliance on data that came into existence only after the close of the comment period normally is improper).

Additionally, the conclusions of the audit report are irrelevant here. First, the In-

spector General audited a sample of data related to calendar year 1995 wage decisions, not 1992 or 1993. *Audit Report* at E–4. Second, the significant errors uncovered by the Inspector General mostly related to wage information, not the classification of employees. While the Inspector General found 211 "significant errors" in 837 of the Department's survey forms, *id.* at E–5, only five (3%) of the errors involved "craft improperly omitted in decision" and only 15(7%) involved "crafts identified incorrectly," the only categories of errors that might be relevant in this case. *Id.* at E–7, Figure 3. Moreover, the report states that "[m]ost of the exceptions ... either did not affect the wage decision or affected the accuracy of a wage decision by a small amount." *Id.* at E–5. Thus, even if this Court could consider the audit report, the plaintiffs have failed to show how it undermines the 1992–93 survey data on the use of helpers.

Even if there were some flaws in gathering the 1992–93 survey data (flaws which the plaintiffs have not substantiated), the undisputed fact remains that this data diverged from the Department's 1987 projection of the use of helpers by a magnitude of 17 to 25. Thus, the Department had adequate reason, at the very least, to re-examine the necessity of the revised helper regulations. *See Drexel Burnham Lambert Inc. v. Commodity Futures Trading Comm'n*, 850 F.2d 742, 749 (D.C.Cir.1988) (holding that a court owes deference to an agency's factual determinations, "including the reasonable inferences drawn therefrom"); *Brown v. Secretary of Health and Human Services*, 46 F.3d 102, 109–10 (1st Cir.1995) (holding that purported statistical flaws in a study upon which an agency relied did not render regulations arbitrary and capricious, because the agency "was not required to base [its] regulations only on perfect information," but only to make a "rational" policy choice). Whether that data would be sufficient ultimately to repeal or amend the revised helper regulations is not before the Court.

2. *Potential for abuse of the helper classification.*

The suspended helper regulations went through several iterations, some court-man-

dated, before they reached their final form and were implemented in 1992. One provision that survived until the D.C. Circuit struck it down was the so-called "ratio cap." *See Building & Constr. Trades Dep't, AFL–CIO v. Martin*, 961 F.2d 269, 277 (D.C.Cir. 1992). The ratio cap provided that there could be no more than two helpers for every three journeyman. Motivating the institution of this cap was the fact that the duties of helpers overlap with those of journeyman, and, therefore, employers may have an incentive to shift what the prevailing practice denominates journeyman work onto the lower-paid helpers. The D.C. Circuit invalided the ratio cap as "unexplained" and "unsubstantiated." *Id.* To comply with this ruling, and without notice and comment, the Department issued a Federal Register notice removing the ratio cap from the helper regulations. 57 Fed.Reg. 28776.

In the December 30, 1996 final rule, the Department cited the elimination of the ratio cap as a reason to re-examine the helper regulations, because, in its view, the cap was one of the principal protections against misclassification of employees as helpers. The Department based its view on the facts that (1) a helper, as defined in the revised helper regulations, is the only classification with duties that are specifically intended to overlap with duties performed by other classifications and (2) the helper classification is unique in that it is based on subjective standards such as skill level and supervision, rather than on an objective test of work performed. 61 Fed.Reg. at 6864546. Therefore, the Department believed that notice and comment rulemaking was necessary to resolve its concerns about misclassifications going unchecked.

The plaintiffs argue that because the D.C. Circuit severed the ratio cap from the rest of the helper regulations, the Department is precluded from re-examining whether any further changes are needed as a result of the elimination of the ratio cap. This argument fails, because the D.C. Circuit merely ruled that the Department had not explained the ratio cap. Nothing in the decision precluded the Department from re-incorporating the ratio cap after conducting notice and comment and providing a proper basis for the cap. While the Department thereafter published a notice removing the cap from the regulations, the sole purpose of this publication was to bring the regulations into compliance with the D.C. Circuit decision. That notice in no way indicated that the Department had considered the impact of the elimination of the ratio cap on the potential for abuse. The Department never "considered and rejected" the necessity of any sort of ratio cap, as the plaintiffs argue.[11]

Finally, the plaintiffs argue that the Department's survey data reveal no evidence of abuse of the helper classification in 1992 and 1993. The final rule, however, focused on "what, if any, changes need to be made to *prevent* potential abuse." 61 Fed.Reg. at 68645 (emphasis added). As the defendants note, the plaintiffs "cite no authority for the proposition that an agency is prohibited from adopting prophylactic measures to prevent potential abuse until *after* the abuse takes place." (emphasis in original).

### 3. *Negative impact on formal training and apprentice programs.*

The Department received several comments stating that the revised helper regulations would impact negatively on formal apprenticeship programs that train future journeymen. 61 Fed.Reg. at 68646. These comments claimed that the ability to pay apprentices a lower wage than that paid to journeyman is a significant incentive for contractors to participate in such programs. They expressed concern, however, that the availability of lower paid. helpers (who, like apprentices, would have duties that overlap with those of journeyman) could cause con-

11. Even though the Department chose to implement the revised helper regulations without addressing concerns raised by the elimination of the ratio cap, and even though that decision may have been reasonable. it does not follow that the Department's present concern over the ratio cap as an obstacle to implementation is unreasonable. *See Paralyzed Veterans of Am.,* at 586 ("[T]here is no barrier to an agency altering its initial interpretation to adopt another reasonable interpretation—even one that represents a new policy response generated by a different administration.")

tractors to withdraw their participation in apprenticeship programs, threatening private funding for apprenticeship and training. If apprenticeship programs were to dwindle, the industry might be faced with shortages of skilled, trained labor. Also, individual workers might find themselves in dead-end, low-skilled jobs without the opportunity to increase their skills.

Other comments pointed out that some contractors use a helper as an entry-level position in which skills are acquired, much like an apprentice. In their view, the revised helper regulations would allow workers to gain experience, promote training of unskilled workers, provide the semi-skilled with the opportunity to gain experience, and provide the unskilled with a first step to higher paying jobs. Based on these conflicting comments, the Department concluded that the impact of the suspended helper regulation on apprenticeship programs "is not fully understood, and should be revisited through further rulemaking."

Without citing any authority, the plaintiffs argue that the "court of appeals found no problem in th[e] area [of apprenticeship programs] justifying non-enforcement of the revised helper rules in 1992, and neither did the Department, until now." The Court has no idea what Court of Appeals decision the plaintiffs have referenced. To the extent they are referring to *Building & Constr. Trades Dep't v. Martin,* cited above, that decision says absolutely nothing about apprenticeship programs; silence is not approval. Additionally, even assuming that the Department expressed no concerns about apprenticeship programs in the past, it does not follow that the Department is precluded from addressing such concerns in the present.[12] Thus, the plaintiffs have not shown that this reason for re-examining the helper regulations was arbitrary or capricious.

\* \* \* \* \* \*

In sum, there is no legitimate dispute over whether the defendants provided a "rational connection between the facts found and the choice made" to continue the suspension of the revised helper regulations while they are re-examined. *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. at 2866. Therefore, the plaintiffs APA claim must be dismissed. Fed.R.Civ.P. 56.

D. *The Plaintiff's Claim under the Unfunded Mandates Reform Act of 1995 Must Be Dismissed.*

■ The plaintiffs allege that the defendants "issued their new [December 30, 1996] Final Rule suspending the revised helper regulations without conducting any of the regulatory impact analyses required by a series of recently enacted statutes," including Section 202 of the Unfunded Mandates Reform Act of 1995, 2 U.S.C. § 1532. *Supplemental Complaint* at ¶¶ 39, 40. They ask this Court to "declare that the new Final Rule is invalid . . . because it was promulgated without advance preparation of the required regulatory analysis and impact statements required under the . . . Unfunded Mandates Act . . ." *Supplemental Complaint* at ¶ 46.

The Unfunded Mandates Act, however, makes it clear that "[i]n any judicial review under any other Federal law of an agency rule for which a written statement or plan is required under [2.U.S.C. § 1532] . . ., the inadequacy or failure to prepare such statement (including the inadequacy or failure to prepare any estimate, analysis, statement or description) or written plan *shall not be used as a basis for staying, enjoining, invalidating or otherwise affecting such agency rule.*" 2 U.S.C. § 1571(a)(3) (emphasis added). Accordingly, the Court will not grant the requested declaratory relief pursuant to the Unfunded Mandates Reform Act.

E. *The Plaintiffs' Claim under the Regulatory Flexibility Act Must Be Dismissed.*

■ The Regulatory Flexibility Act provides that "[w]henever an agency is required . . . to publish general notice of proposed rulemaking for any proposed rule, . . . the agency shall prepare and make available for public comment an initial regulatory flexibility analysis." 5 U.S.C. § 603(a). The analy-

12. *See* note 11, *supra.*

sis must describe "the impact of the proposed rule on small entities." *Id.*

The Act further requires that "[w]hen an agency promulgates a final rule under section 553 of [the Administrative Procedure Act], after being required by that section or any other law to publish a general notice of proposed rulemaking, ... the agency shall prepare a final regulatory flexibility analysis." *Id.* § 604(a). Among other things, the Act requires the final regulatory flexibility analysis to contain "a description of the steps the agency has taken to minimize the significant economic impact on small entities ..." *Id.* § 604(a)(5).

The plaintiffs allege that the defendants violated these provisions of the Act. *Supp. Complaint* at ¶¶ 41, 42. In response, the defendants point to a provision of the Act that excuses compliance when (1) "the head of the agency certifies that the rule will not, if promulgated, have significant economic impact on a substantial number of small entities" and (2) the agency publishes the certification in the Federal Register along with the proposed or final rule, including a statement providing the factual basis for such certification. *Id.* § 605(b).

When the Department published the continued suspension as a proposed rule on August 2, 1996, it stated that "the proposed rule will not have a significant economic impact on a substantial number of small entities." 61 Fed.Reg. at 40368. In fact, the Department found there would be no economic impact, because the proposed rule would continue "the status quo." *Id.* Further, if the revised helper regulations were re-implemented, they would not have a significant economic impact on small entitles, because (1) the 1992 and 1993 surveys suggest that the use of helpers prevails in relatively few job classifications and (2) due to "the lag times in agency procedures to amend their regulations and incorporate contract clauses," it is unlikely that a substantial number of small entities could use the suspended helper regulations in the interim period while the Department completes a substantive rulemaking on the helper rules. *Id.* Accordingly, the Department concluded that the continued suspension was not expected to have a "sig-

nificant economic impact" on a substantial number of entities, and it certified this conclusion to the Chief Counsel for advocacy of the Small Business Administration. *Id.*

The plaintiffs' claim under the Regulatory Flexibility Act must be dismissed, because the Department has satisfied all of the elements of the exception—(1) certification of no significant economic impact on small entities and (2) publication of the certification in the Federal Register with the proposed rule, accompanied by a statement of reasons. The plaintiffs' arguments to the contrary must be rejected.

First, the plaintiffs argue that the rule continuing the suspension does not continue the status quo, because the suspension "was, or should have been, lifted in either April or August of 1996," and the rule "establishes a new suspension with entirely different premises from those supporting the previous suspension of the revised helper rules." As discussed above, however, the Court has dismissed the plaintiffs' claim that the defendants' continuation of the suspension past April 26, 1996 was unlawful. Moreover, even if it is assumed that the continuation of the suspension was unlawful, the undisputed fact remains that the revised helper regulations were not re-implemented in April 1996 and, indeed, have not been in effect since 1993. Thus, the Department was correct in certifying that the proposed continuation of the suspension would continue the economic status quo.

Second, the plaintiffs argue that the Department previously found that the suspended helper regulations would reduce the costs of government construction by more than $600 million. Such cost savings estimates, however, were based on assumption that the use of helpers was prevailing in two-thirds to 100 percent of all job classifications, an assumption that the 1992–93 survey data seriously call into question. In light of this survey information and the lag time for the agency to amend its contract forms, it was reasonable for the Department to conclude that relatively few small entities would be able to use the helper classifications during the time in which the Department intends to

complete substantive rulemaking on the helper rules.

### F. *The Plaintiffs' Claim under the Davis Bacon Act Must Be Dismissed.*

▇ The Davis Bacon Act requires that the advertised specifications for each federal construction project in excess of $2,000 contain minimum wage provisions for each class of laborer and mechanic based upon prevailing wages in the locality of performance as determined by the Secretary of Labor. While it may be true, as the plaintiffs argue, that "[i]t is the Department's statutory responsibility to issue wage determinations for all classes of laborers and mechanics which 'prevail' in every locality where they do prevail," the Department has broad discretion to recognize and define the various classes of workers for whom the prevailing wage must be determined. *See Building & Constr. Trades Dep't,* 961 F.2d at 271. (recognizing the Secretary of Labor's "broad statutory mandate to set wages and classify workers").

▇ Accordingly, the Department has broad discretion to recognize and define the helper classification, and nothing in the Davis Bacon Act requires the Department to adopt a particular helper definition. *See Building & Construction Trades' Dep't, AFL–CIO v. Donovan,* 712 F.2d 611, 626 n. 9 (D.C.Cir. 1983) ("[T]he long-held view of the Secretary and the legislative history of the statute taken as a whole persuade us to agree that the Secretary is empowered to recognize at least some form of semiskilled classification."); *Building & Constr. Trades Dep't, AFL–CIO v. Martin,* 961 F.2d at 275 ("[T]he Secretary of Labor's statutory authority does not require task-oriented definitions [of helpers].").

▇ As noted above, the defendants have not abused their discretion in postponing the effective date of the revised helper regulations and continuing its longstanding practice regarding helpers, which is to approve a helper classification only if it is "a separate and distinct class of worker that prevails in the area, the duties of which can be differentiated from the duties of journey level workers." 58 Fed.Reg. 58954. This Court cannot

conclude that this helper definition (which eventually may be superseded by the one the plaintiffs prefer) "bears no relationship" to, or "defeat[s] the purpose of," [13] the Davis Bacon Act, especially because, except for a 20–month period in 1992 and 1993, the current helper classification has been the Department's practice for decades.

### IV.

### Conclusion

For all the foregoing reasons, the plaintiffs' motion for summary judgment is denied, and the defendants' motion for summary judgment granted. The plaintiffs are not entitled to injunctive or declaratory relief, and their complaint shall be dismissed.

---

13. *Building & Constr. Trades Dep't, AFL–CIO v.* *Donovan,* 712 F.2d at 616.